1316

In the Matter of the Complaint and Petition of INTERNATIONAL MARINE DEVELOPMENT CORP., a Liberian Corp., as Owners of the SS HULDA, in a Cause of Exoneration from or Limitation of Liability, Civil and Maritime.

In the Matter of the Complaint and Petition of ONEIDA STEAMSHIP COMPANY, Inc., a New York Corp., as Owners of the SS SILVER HAWK, in a Cause of Exoneration from or Limitation of Liability, Civil and Maritime.

In the Matter of the Complaint and Petition of the UNITED STATES of America, as Owners of the SS ALAMO VICTORY, for Exoneration from or Limitation of Liability.

Civ. A. Nos. 3878, 3879 and 3992.

United States District Court,
S. D. Mississippi, S. D.

May 21, 1971.

A. S. Johnston, II, Biloxi, Miss., John S. Morris, Gulfport, Miss., for claimants in all actions.

T. Glover Roberts, Gulfport, Miss., E. S. Ned Nelson, Pascagoula, Miss., for claimant in No. 3992.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Thomas L. Jones, Admiralty & Shipping Section, Dept. of Justice, Washington, D.C., for claimants in Nos. 3878, 3879.

Robert E. Meshel, New York City, for claimants.

NIXON, District Judge.

### FINDINGS OF FACT

1.

These three consolidated actions arose out of Hurricane Camille which struck the Port of Gulfport, Mississippi on the night of August 17 and the early morning of August 18, 1969. The various claimants except India Supply Mission, cargo owner aboard the HULDA, in each of these three actions which were tried to the Court contend that the owners of the SS HULDA, SS SILVER HAWK and SS ALAMO VICTORY were liable for their respective damages and injuries on the theories of (1) negligence (a) by remaining in the Port of Gulfport and not putting out to open sea or to the harbors in Mobile or New Orleans when warned of the approach of the impending hurricane, and (b) in failing to properly and safely moor the vessels in preparation for the hurricane while in port, and (2) in not maintaining the vessels in a seaworthy condition.

2.

The owners of the three vessels filed their separate and independent actions herein for exoneration from or limitation of liability contending that the damages and injuries complained of by the property damage and personal injury claimants were caused solely by an Act of God and were not occasioned by any negligence on the part of those in charge of the operation of the vessels or any un-

E. S. Ned Nelson, Pascagoula, Miss., George Wood, Mobile, Ala., for petitioners in Nos. 3878 and 3879.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Percy R. Peck, Maritime Administration, Thomas L. Jones, Admiralty & Shipping Section, Dept. of Justice, Washington, D.C., for petitioner in No. 3992.

C. W. Ford, Pascagoula, Miss., for claimant in No. 3878.

Robert C. Galloway, Gulfport, Miss., James W. Mehaffy, Beaumont, Tex., Robert Milner, Jr., Gulfport, Miss., for claimant in No. 3879.

seaworthiness of the vessels, and further contend that in any event, the property damage and personal injury claimants have failed to prove their alleged claims by a preponderance of the credible evidence.

### 3.

The claimants, James P. Martin and James B. Martin, d/b/a Port Marine Supply, have filed their claims against all three of the vessels in question for property damage to their piers, wharves and hoisting crane located at the north end of Gulfport harbor which they contend resulted from the three ships being washed ashore during Hurricane Camille. In addition, 23 crewmen of the ALAMO VICTORY have filed their claims against her contending that they sustained nervous shock and other injuries to the nervous system and psyche, as well as physical injuries and illnesses to various parts of their bodies, including severe cases of diarrhea, eye injuries due to a fluid being blown into the eyes of several claimants as a result of the contents of storage facilities in the Port of Gulfport being blown over and around said vessel, and other internal injuries. The owners of the SS HULDA and SS SILVER HAWK have also filed claims for collision damages against the United States, owner of the SS ALAMO VICTORY. Other than the Martins' claim, the other claims against the SS SILVER HAWK were made by the owners of the ALAMO VICTORY for damages resulting from her being struck by the SILVER HAWK, and by Bennett Patrick, a crewman who filed his personal injury claim for damages consisting of a torn right media meniscus requiring surgery. He contends that his injured knee which resulted from three separate incidents of injury thereto, two of which occurred during the hurricane and one subsequent thereto while descending to the ground via a ladder from the gangway of the HULDA after having crossed from the SILVER HAWK onto the HULDA after the hurricane had passed. The other claims against the HULDA were made by the owners of the ALAMO VICTORY for damages resulting from her being struck by the HULDA and by the cargo owner of urea which had been taken aboard the HULDA prior to the hurricane and which the vessel owners refused to unload subsequent thereto while she was beached. The cargo owner, India Supply Mission, sues for its cost and expense of this unloading and reloading aboard another ship, although there was no damage to or loss of any of the urea.

### 4.

This Court consolidated these three causes of action for purposes of this bifurcated trial to determine whether any or all of the petitioners are entitled to exoneration from or limitation of liability pretermitting the question of the amount of compensable damages, if any, that any of the claimants are entitled to receive, to be resolved at the second stage of this trial in the event that any or all of the three petitioners are not entitled to exoneration.

### 5.

Several witnesses were heard in open Court and several depositions were received in evidence. Various other exhibits were received, including pictures, statements, ships' logs, and the Environmental Science Services Administration's Preliminary Report on Hurricane Camille dated September, 1969 [1] and Environmental Science Services Administration's Report to the Administrator on Hurricane Camille prepared under the direction of Donald C. House dated September, 1969.[2] The facts in both of these reports are stipulated by all of the parties hereto to be true and correct.

### 6.

The ALAMO VICTORY, owned by the United States of America and operated

---

1. See Exhibit P–1.

2. See Exhibit P–2.

by her through the Maritime Administration, was a single screw turbine steam cargo vessel of 7,612 gross tons or 4,555 net tons, 439′ 1″ in length, 62′ 1″ in breadth, and 34′ 5″ in depth. Her Captain or Master was Captain Martin J. Gaughan. She had departed from Todd Shipyard in Algiers near New Orleans, Louisiana on the afternoon of August 13, 1969 after having undergone a U. S. Coast Guard biennial inspection, having been issued a new Certificate of Seaworthiness without exception by the U. S. Coast Guard upon completion of the inspection on August 13, although she was experiencing and did experience on the journey down the Mississippi River toward Gulfport some difficulty with one of her boilers, repairs to which were being completed in Gulfport after she arrived on August 14, 1969 but which had not been fully completed as of the time that Hurricane Camille struck on the evening of August 17. The purpose of her trip to Gulfport was to take on a military cargo for Viet Nam, then to be "topped off" with fuel in Pascagoula, Mississippi before getting underway for South Viet Nam via the Panama Canal. Her scheduled sailing time from Gulfport was Midnight August 15, however because of the boiler repairs, she rescheduled to leave the following night but her Captain decided to stay in port because of the impending danger of Hurricane Camille.

### 7.

The SS SILVER HAWK was a "Victory" ship of 7,613 gross tons, 4,586 net tons, 455′ 3″ in length, and 62′ 1″ in width, and is a single screw steam-driven vessel with a cargo capacity of approximately 10,000 tons. Her Captain and Master was Captain John H. Young. Oneida Steamship Company, Inc. was the owner of the vessel and Avon Steamship Company was her operator. She arrived at the Port of Gulfport at approximately 8:00 or 8:30 A.M. on August 16, 1969, having been diverted thereto by radio message from Avon Steamship Company from her immediate destination, Beaumont, Texas. She was diverted into Gulfport for the purpose of loading a full cargo of urea for transportation to Hong Kong and not because of the existence of what was at that time a tropical storm which later developed into Hurricane Camille. The cargo had not been loaded aboard the SILVER HAWK prior to the time that Hurricane Camille struck and she was "in ballast".

### 8.

The SS HULDA had arrived at the Port of Gulfport on August 11, 1969 for the purpose of loading cargo consisting of 93,132 bags of urea owned by one of the claimants against her, India Supply Mission. The urea was loaded aboard prior to the arrival of Camille. The International Marine Development Corporation, a Liberian corporation was the owner and operator of the HULDA which was manned by a Korean crew and whose Captain or Master was Chinese, Captain Tsai, Yen-Hsi. She was a ship of 9,810 gross tons, 7,091 net tons, 497′ 6″ in length and 64′ 5″ in width. She was at all times while in the Port of Gulfport under Charter to the Director General of India Supply Mission, for and on behalf of the President of the Union of India (India Supply Mission, one of the claimants herein against the HULDA).

### 9.

After all three of these vessels had put into the Port of Gulfport, located on the Mississippi Sound, a part of Gulf of Mexico, with a relatively narrow channel which had a moving depth of 27 feet with a width at its narrowest point of 230 feet, they were moored "port to" the west pier of the Gulfport Harbor all facing in a northerly direction toward land where they remained from the time of their mooring until Hurricane Camille struck on August 17, 1969 in the following positions with relation to each other: the ALAMO VICTORY was tied up or moored nearest land or to the north of the other two vessels with approximately 50 feet of sufficiently deep water to the

north of her; directly astern of her at a distance of approximately one ship's length or 500 feet was the SS HULDA; and astern of the HULDA at a distance of approximately two ship's lengths or 1,000 feet was the SS SILVER HAWK. The SILVER HAWK was in ballast and riding high on the water with approximately 300 tons of ballast aboard on arrival at Gulfport. Its draft at that time and at the time that Camille struck was approximately 16 feet aft and 18 forward. If she had been fully loaded she would have had approximately a 30′ 3″ mean draft. It would have been impossible to add sufficient ballast to have significantly changed the SILVER HAWK's draft between the time of her arrival on the 16th of August and the time that Camille struck because of the time factor. The ALAMO VICTORY's mean draft was in excess of 17 feet. All other smaller craft had been removed from the Gulfport Port up the rivers and back bays into more sheltered harbors, none of which could have been utilized by these three ships because of their size and draft.

### 10.

The nearest major and sufficiently large ports to the Port of Gulfport were the Port of Mobile, Alabama, some 33 miles east from the Gulfport Sea Buoy and up Mobile Bay approximately 30 miles north of the Mississippi Sound shoreline, and the Port of New Orleans, Louisiana, a little farther to the west and located approximately 20 miles up the Mississippi River. The Captains or Masters of all three of these large vessels in question independently made the determination to remain in the Port of Gulfport during Hurricane Camille in view of weather advisories and forecasts which they had been receiving from the Coast Guard and commercial television and radio stations with reference to the location, forward speed and known and predicted course of Camille. These

decisions by the three Masters were made without the knowledge or privity of the owners or operators of the vessels.

### 11.

Hurricane Camille, the most intense storm to ever strike the North American Continent and probably the worst in the history of the western hemisphere [3] was spawned from a tropical wave and detected on the 14th of August, 1969 approximately 60 miles west of Grand Caymen Island, approximately 480 miles south of Miami, Florida. She developed rapidly, and early on the following day, August 15, was a small but potent hurricane pursuing a northwesterly track having reached hurricane intensity about 60 miles south-southeast of Pinar del Rio. This hurricane was under constant surveillance of the Havana, Cuba weather radar, and reports therefrom were being sent to the National Hurricane Center at Miami, Florida, as Camille edged closer to Western Cuba. Although she was still maturing, her winds had already reached 115 miles an hour on the afternoon of the 15th and the central barometric pressure had dropped to 28.53 inches. It was at approximately this time that news of the existence and location of this hurricane was disseminated through official and unofficial sources, and when the Masters and radio operators as well as other crewmen aboard the HULDA, ALAMO VICTORY and SILVER HAWK began mapping and plotting the location and movement of Camille, which they continued to do, based on Coast Guard and commercial television and radio reports, until she struck the Mississippi Gulf Coast with great intensity, destructiveness and rath. Camille moved across Western Cuba on the evening of the 15th, was off the northern coast before the day was over, and weakened only slightly during her trek over land; however, once again when she was over the warm Gulf of Mexico waters she began to regain her

---

3. See Exhibit P-1, ESSA Preliminary Report on Hurricane Camille and Exhibit P-2, ESSA Report to the Administrator, the truth and accuracy of both being stipulated to by all of the parties herein.

strength and was moving at approximately 10 miles an hour. Early on August 16th a hurricane watch was established from Biloxi, Mississippi eastward to St. Marks, Florida at a time which was more than 36 hours before the hurricane struck the U. S. mainland. Late reports from reconnaissance aircraft on the late afternoon of the 16th indicated the hurricane had slowed but had deepened rapidly; maximum winds were estimated at 150 miles an hour near the center which was located approximately 380 miles south of Ft. Walton, Florida. Later that evening Camille began a north-northwestward trek at about 12 miles an hour at which time she was generating 160 mile an hour winds near her center with hurricane force winds extending out 50 miles in all directions from the eye.

12.

Early on the morning of Sunday, August 17th the hurricane was 250 miles south of Mobile, Alabama and at this time, hurricane warnings which were already in effect for the Florida Panhandle, were extended westwardly to include the Coast of Alabama as far west as Biloxi on the Mississippi Coast approximately 12 miles east of Gulfport. A few hours later, warnings were issued for the entire Mississippi Coast and as far west as New Orleans and Grand Isle, Louisiana. At this time Camille was approximately 200 miles southeast of New Orleans and reconnaissance reports early on the afternoon of the 17th indicated a central barometric pressure of 26.63 inches (second only to the Labor Day hurricane of 1935) and maximum winds were estimated at 190 miles per hour near the center. Tides up to 20 feet above normal were forecast from Gulfport eastwardly to Pascagoula, Mississippi an area of approximately 40 miles, and 8 to 10 inches of rain was predicted for southeastern Mississippi. By 7:00 P.M. on the 17th, with Camille approximately 60 miles east of New Orleans, an off-shore drilling rig was raked by gusts of 170 mile an hour winds. Her eye moved inland just east of Bay St. Louis, Mississippi, approximately 16 miles west of Gulfport, which put Gulfport and Biloxi in her eastern quadrant, the most dangerous and destructive part of a hurricane. Hurricane force winds began hitting Gulfport at approximately 8:00 P.M. on August 17th, and the unprecedented force and fury of wind and tidal wave created by Camille reached the height of their rage at between 11:00 P.M. on August 17th and 1:00 A.M. on August 18, 1969. The undisputed proof in this case shows that the winds in this hurricane attained a velocity and force of at least 200 miles per hour and tides ranged between 15 to 30 feet above normal just east of the eye and up to five feet above normal as far east as Appalachicola, Florida. The barometric pressure on the Mississippi Coast fell to an unprecedented low of 26.61 inches. The rainfall over Southeastern Mississippi, Northeastern Louisiana and Southwestern Alabama ranged from 3 to 6 inches with a maximum fall of more than 11 inches in Hancock County, Mississippi only several miles west of Gulfport. She moved up past the Coast through the State of Mississippi causing rainfall of 2 to 3 inches in the northern areas of the State and began to weaken as she moved north-northwestward through Central Mississippi. Wind gusts up to 100 miles an hour extended north to near Prentiss which is 100 miles inland from the Gulf Coast, and Jackson, Mississippi located approximately 175 miles north of the Coast experienced wind gusts up to 67 miles per hour. She departed Mississippi, moved north-northeastward across Western Tennessee producing heavy rains there, and on August 19th the then depression turned eastward through Kentucky and into the Appalachians causing rainfall of 4.25 inches at West Liberty, approximately 60 miles southwest of Huntington, West Virginia. The remnants of Camille produced torrential rains over the Appalachians causing flash flooding in Southeastern West Virginia and Southwestern Virginia result-

ing in the most severe flooding of the James River and its tributaries for nearly a century. These torrential rains produced numerous landslides on the eastern slopes of the Appalachian Mountains which swept into hollows destroying roads, bridges and railroads. She then moved off the Atlantic Coast east of Norfolk, at approximately 25 miles an hour and regained tropical storm strength the following morning before turning east-northeastward about 400 miles east of the Virginia Capes with maximum winds reaching 65 to 70 miles an hour late in the day. Her forward speed increased to 35 miles an hour; however, by August 22, Camille merged with a frontal system and lost her identity as a tropical storm some 175 miles southeast of Cape Race, Newfoundland.

### 13.

By far the hardest hit area of Mississippi was the Gulf Coast area where the Red Cross reported that 4,238 homes were destroyed and 11,667 suffered major damage; 1,007 trailer homes, 569 small businesses, and 32 boats were either destroyed or severely damaged. A preliminary survey by the Corps of Engineers showed that at least 94 vessels were sunk or grounded in the Mississippi River which was in the western quadrant of the hurricane, including nine seagoing vessels grounded near Head of Passes; furthermore, at least 65 crew boats, barges and tugs were grounded and nine barges were sunk. The oil industry suffered losses estimated to be in the millions of dollars. The American Insurance Association estimates insured losses to repair or replace properties and their contents at $165 million dollars, with the majority of these losses occurring in Mississippi where the figure stands at $138 million dollars.

### 14.

Pages 5–17 of Exhibit P–1 contain the National Hurricane Center's Advisories, bulletins and special advisories concerning the location, speed, direction of movement and anticipated future course and conduct of Hurricane Camille beginning with Advisory No. 1 issued at 1:00 P.M. EDT, Thursday, August 14, 1969 through Advisory No. 18 issued at 11:00 P.M. CDT, Sunday, August 17, 1969. These advisories and bulletins conclusively show that the course and direction of this killer-hurricane and exactly where it would strike was very uncertain and unpredictable up until a very few hours before it actually hit shore. It was expected to strike Northeast of the Mississippi Gulf Coast, and even as late as 7:00 A.M. on August 17, the evening that it struck, the center was forecast to move inland near Mobile that night inasmuch as it was 230 miles south of Mobile moving on a course a little west of north at approximately 12 miles per hour with a prediction of a slightly more northerly turn. At that time its highest winds were estimated at 160 miles per hour near the center and hurricane warnings were in effect from St. Marks, Florida as far west as Biloxi, Mississippi with gale warnings elsewhere. It was not until Advisory No. 14 was issued at 9:00 A.M. CDT, Sunday, August 17 that hurricane warnings were extended westward from Biloxi to include the balance bounds of the Mississippi Gulf Coast and Southeastern Louisiana as far west as New Orleans and Grand Isle. It is quite evident that even the experts were far from certain where Camille would strike because this advisory shows that hurricane warnings were in effect over approximately 300 miles of the Gulf Coast from New Orleans and Grand Isle, Louisiana eastward across Mississippi, Alabama and the Northwest Florida Coast to St. Marks, with gale warnings in effect from Morgan City, Louisiana to Cedar Keys, Florida. At that time indications were that the center of Camille would pass close to the mouth of the Mississippi River late on the 17th and move inland on the Mississippi Coast that night. Special Advisory No. 16 issued at 3:00 P.M. CDT, August 17, was the first bulletin or advisory that failed to predict a more northerly swing or turn of this destructive freak of nature.

15.

Each of the Captains or Masters of the three vessels in question who had spent many years at sea and were highly trained and well-qualified to perform their jobs, independently of each other, determined that their ships would remain in the Port of Gulfport which they considered the safest place to be in view of the various conflicting weather reports concerning the predicted course of Camille. Their decisions are supported in this record by the testimony of Captain James A. Crosland, Executive Vice-President in charge of Walsh Stevedoring Company's Gulfport operation for the last 25 years who held an unlimited Master's license to operate or captain any ship of any size in any waters, and the testimony of Captain Steven A. Jennings, Assistant Director of Operations for the Gulf Coast District of the United States Maritime Service who has been employed thereby for 19 years and who also held an unlimited Master's license for the past 30 years in addition to five first-class pilots licenses. These three experienced and trained ship's Captains were and are of the considered opinion that if they left the protected harbor of Gulfport and put out to sea as claimants contend they should have, they would have subjected their ships and crews to a much greater risk of danger, inasmuch as some weather reports predicted Camille would veer more to the northeast and hit the Port of Mobile, Alabama some 33 miles to the east, even as late as 7:00 A.M. on August 17, while others were predicting that Camille would enter the mouth of the Mississippi River near New Orleans, a little farther distance to the west of Gulfport. As a matter of fact, at 9:00 A.M. on August 17, hurricane warnings extended for a distance of approximately 300 miles across the Gulf from Northwest Florida to a point west of the mouth of the Mississippi River, thus for a considerable distance both west and east of Gulfport. Each of these ships' Masters and their officers continuously plotted the course of Camille based on reports being received by their radio operators and reports being received on television and radio aboard. Pilotage out of the Gulfport Harbor which was available only until noon on August 17, because the pilot boats were removed from the harbor to safer shelter in the Back Bay of Gulfport (where these three large ships could not be taken) some time shortly after 9:00 A.M. on August 17, would have been very difficult because of the very narrow channel of the Gulfport Harbor with a moving depth of 27 feet and a 230 foot width at its narrowest point, which is approximately one-half the length of each of these large vessels. It would have taken approximately 2–2½ hours pilotage of a very tricky nature to back these ships into the turning basin, and to turn them around without the help of tugs which were not available on the afternoon of August 17. Until noon on that day reports were still being received that the hurricane would hit Mobile to the East of Gulfport and the mouth of the Mississippi River to the West. Even if these ships could have successfully maneuvered out of the Port of Gulfport they would have had two choices: (1) to go East toward Mobile where the hurricane was predicted to strike, or (2) to travel southwest past the Mississippi River between 120 and 150 miles from the pilot station at Gulfport in order to navigate past the Mississippi River Passes out into deep water where they could be maneuvered normally in an attempt to avoid the hurricane. Captain Young of the SILVER HAWK, who held an unlimited Master's license testified by deposition [4] that the SILVER HAWK would have had to slow considerably on the fringe of the hurricane because she was in ballast riding high on the water which would have caused her propeller to have often left the water resulting in damage to her engines. It would have taken approximately 15 to 18 hours before any of these ships could have reached an area to allow normal

4. Exhibit P–3.

maneuvering to avoid the storm, and the trip to the Mobile Harbor which would have taken approximately five hours, would have also constituted a gamble particularly in view of the fact that the weather forecasts up until Special Advisory No. 16 at 3:00 P.M. CDT on Sunday, August 17, 1969 predicted that Camille would swing more to the North or Northeast. Based on all of the foregoing information, and their experience and training the Masters of these three vessels independently determined in their best judgment, without consulting with the owners of the vessels or being advised by anyone to the contrary, to remain in the protected Port of Gulfport which each considered to be the safest and best harbor in this area of the Mississippi Sound or Gulf of Mexico to ride out this monstrous and threatening hurricane with an erratic and unpredictable course.

### 16.

All parties to this action stipulated and agreed of record, and the Court finds that the failure of any claimant in Civil Action No. 3878 to deny or respond in any way to International Marine Development Corporation's (Owner of the SS HULDA) Request for Admissions of Facts, admitted all of the matters contained therein.[5] Specifically, all claimants therein against International Marine Development Corporation, the Liberian Corporation which owned the SS HULDA, admitted pursuant to Rule 56 of the Federal Rules of Civil Procedure: "(a) that the hull, machiner, equipment, ground tackle, navigational gear, and other parts of the SS HULDA, pertinent to this action, were in proper operating condition and seaworthy and that on board there was a crew of sufficient and competent personnel as of August 17, 1969 at the onset of Hurricane Camille at Gulfport, Mississippi; (b) that on August 17, 1969, the following precautions were taken in preparation for the onset of Hurricane Camille by the Cap-

tain and crew of the SS HULDA: (1) the forward, or head mooring lines were increased to five (5) in number; the stern lines were increased to five (5) in number; and the spring and breast lines were doubled; (2) hatch covers and cargo gear was secured by 1730 hours on August 17, 1969; (3) the deck watch was doubled with instructions to stand by all lines and make certain that they were tight and secure; (4) the port anchor was let out with fifteen (15) fathoms of chain; (6) the engines and machinery were put on standby ready; (c) the lines used to secure the SS HULDA to the dock held until 2150 hours on August 17, 1969, when at that time the SS SILVER HAWK had come adrift and fallen into the stern of the SS HULDA and parted some of the stern lines; (d) that Capt. Tsai Yen-Hsi, the Master of the SS HULDA, if he were present to testify, would testify to the truth of the facts as set forth in the preceding request for admissions in paragraphs one, two and three; and (3) that Capt. Yeh Chao-Wen, the First Mate of the SS HULDA, if he were present to testify, would testify to the truth of the facts as set forth in the preceding request for admissions in paragraphs one, two and three." In addition, the HULDA had two "typhoon" mooring lines (manila hull lines with a 12″ diameter, 20′ in length with steel eyes on each end. Steel cables are placed therein and tied to bollards).

### 17.

Preparations for the onslaught of Hurricane Camille were begun on the SS SILVER HAWK by her Captain or Master, Captain John H. Young, and his crew on the early morning of August 17. Although Captain Young had previously given his crew shore leave, he nevertheless was able to contact and recall aboard ship his Chief Mate, two Third Mates and approximately 20 other crewmen, including the radio officer who had remained aboard and continually moni-

---

5. Exhibit P–5.

tored all weather information concerning Camille and two assistant engineers as well as five or six deck crewmen who were sufficient in number and skill to slack all of the lines which were tied out. In addition, he utilized the services of 20 longshoremen who were working in the hole of the vessel, putting them to work in helping secure the SILVER HAWK. Security measures included working both the starboard and port anchors to one shot (90 feet) of chain in the water, tying six bow lines including three spring lines forward plus one "bight" (a bight consisting of two lines tied to each of the metal bollards set in concrete on the west pier of the Gulfport Harbor, as well as a long bight of chain of the mooring line all tied on all available bollards on the dock). Also, five stern lines were secured to the remaining bollards available to the SILVER HAWK, including two springs and a long bight of a wire mooring line.

### 18.

The ALAMO VICTORY, whose mean draft was in excess of 17 feet, put out both the starboard and port anchors as well as 28 mooring lines, 20 more than the usual number, eight of which were new nylon lines capable of withstanding 120,000 pounds of pull each, which were rigged to eight metal bollards set in concrete on the pier. She, as well as the other two ships, was battened down in all respects and checks were made to insure that all emergency systems were operable and standing by. The ALAMO VICTORY had her full crew on board (with the exception of two men) which was more than the Coast Guard required, and also had an additional officer aboard. Although one of her boilers was not operating and she did not start her engines at any time, nevertheless she was prepared to start her engines in the event that she went adrift and it was necessary to do so. She had just received her Certificate of Seaworthiness, without exception, as aforementioned. Approximately three quarters of her storage space was loaded with cargo,

with a total tonnage of 2,500 to 3,000 tons.

### 19.

At approximately 5:00 P.M. on August 17, the Captain of the SILVER HAWK instructed the Chief Engineer to prepare the engines for operation and ordered the Chief Mate to test all navigational equipment, including the steering gear, whistle, etc., which was done and found to be in good working order.

### 20.

The hurricane force winds from Camille blowing from the Northeast struck Gulfport after dark at approximately 8:00 P.M. on August 17, 1969 and quickly went around to the East indicating that the center was moving rapidly. At this time all three of the ships were held against the dock. The hurricane winds increased in intensity and went around 180° from Northeast to East to Southeast to South and then to Southwest by approximately 10:30 P.M. During this time visibility was very poor because of the driving rain accompanying the hurricane. When the winds went to the Southeast it became much stronger and at that time the SILVER HAWK was being pushed ahead. Her steam turbine engine was put at one-half speed astern and approximately 30 to 45 minutes later at full speed astern, but she was unable to run astern for a lengthy period of time without overheating the stern section of the main turbine because it and all auxiliaries were designed for an ahead operation. The Chief Engineer came to the bridge and informed the Captain that the turbine engine could not run astern any longer because it was about to burn the main engine; at approximately 9:30 or 10:00 P.M., instead of stopping this engine the Captain instructed the Engineer to run it ahead slowly in order to cool it down so that it could again run full astern, which was attempted without success. The engines on the HULDA and ALAMO VICTORY were on standby but were apparently never started.

**21.**

At approximately 10:30 to 11:00 P.M. the SILVER HAWK experienced a large surge of tide, later measured to be approximately 22 feet above normal, which tore some of her shorter lines and split and ripped the bollards from their concrete foundation on the pier causing her to go adrift and holing her engine room resulting in the entrance ten feet of water. The SILVER HAWK rammed the HULDA in the way of her number two hatch causing considerable damage to the two vessels which hung together for a short period of time. Then following a series of collisions involving the SILVER HAWK, the HULDA and the ALAMO VICTORY with each other and with the dock, which was almost impossible to accurately describe because of the poor visibility and the utter confusion, the ALAMO VICTORY came back and slammed into the HULDA breaking her loose from the SILVER HAWK and the HULDA again struck the SILVER HAWK.

**22.**

At approximately 1:00 A.M. on Monday morning August 18, the SILVER HAWK took a port list when she went aground at the north or shore end of the Gulfport Harbor at which time her number four hatch contained approximately one foot of water. The ALAMO VICTORY went ashore alongside the HULDA and the SILVER HAWK was beached directly behind the other two vessels with her bow between them.

**23.**

The ALAMO VICTORY was sometime later refloated and sailed to Beaumont, Texas, but the SILVER HAWK and the HULDA were constructive total losses and were sold as scrap for the respective amounts of $46,375.00 and $54,375.00 in arms length transactions.

**24.**

After the hurricane had passed, it was later determined that some of the lines on all three of the vessels had broken while others had come loose from the pier because the bollards had split or pulled out of their concrete foundations, all of which is evidenced by many pictures received in evidence.[6] No one saw any of the three vessels strike the facilities of the claimants, Martin, d/b/a Port Marine Supply, facilities but they came to rest where the Martins' piers and auxiliary facilities had been. The HULDA was resting where the Martins' piers had existed and the ALAMO VICTORY was abreast of her with the SILVER HAWK just east of where the Martin piers were with its bow resting where the easternmost of the three piers had been.[7] Many other facilities, including piers and buildings in the immediate vicinity of the Gulfport Port, both to the south and north of U. S. Highway 90 all up and down the Mississippi Gulf Coast were destroyed and/or extensively damaged by wind and/or water generated by Hurricane Camille, including a shrimp factory and catfood factory located just west of the Martins' facilities. Even the claimant, James B. Martin, who owned and operated Port Marine Supply in conjunction with his father, James P. Martin, from whom he rented some of his facilities, admitted on cross examination that he did not know what damage was caused to his facilities by the three ships and what damage was caused by the wind and water before the ships were washed ashore.

**25.**

Although 23 of the crewmen of the ALAMO VICTORY filed their claims herein against her owner, the United States of America in Civil Action No. 3992, little evidence was offered in support of any of these claims, which in part consisted of the testimony of Clarence Smith, Jr., assistant engineer there-

6. See Exhibit P–8 (L–F).

7. See Exhibit P–8(a).

on whose testimony failed to prove any injury to himself, although he stated that all of the crew which remained aboard the beached ALAMO VICTORY until approximately September 25, 1969, when she had been refloated and taken to Beaumont, Texas suffered from diarrhea because only half of the toilet facilities and showers on the starboard side could be utilized. It was established and the Court finds that any member of the crew of the ALAMO VICTORY who would have requested to be relieved would have been permitted to leave the vessel at any time subsequent to the hurricane, several having made this request which was granted shortly after she was beached. The only additional evidence offered in support of any of these 23 claims was a certified photocopy of Clinical Records of Public Health Service Hospital at New Orleans, Louisiana which purported to indicate that one of the crewmen, Clifford Davis, Jr., sustained a minor back injury when knocked off a bench during Hurricane Camille.[8] However, inquiry was made by the Chief Mate on or about August 18, 1969 and by officials of the Maritime Service when the crew was paid off at Beaumont, Texas, as to whether any crewman had suffered any injuries or had any complaints resulting from the hurricane or conditions aboard the ship thereafter, and that no report of any injury or any illness of any kind was made to or by any officer or any crewmen aboard the ALAMO VICTORY, and none was observed by anyone. There were no indications of any claimed injuries or illnesses until these 23 seamen filed their claims against the United States.

26.

With reference to the personal injury claim of Bennett Patrick, a crewman who was performing the job of oiler aboard the SILVER HAWK and who filed his claim herein against the Oneida Steamship Company, Inc., the owner thereof, in Civil Action No. 3879,

the claimant seeks to recover for personal injuries consisting of a torn right medial meniscus caused or contributed to by three alleged accidents or incidents: (1) when he twisted his right knee when he slipped on oil on the deck in the main engine room during the height of the hurricane at a time when the ship was being tossed and bumped about; (2) when his right knee was struck by a swivel chair which swung in the mess room where he had chosen to go during the hurricane; and (3) when he twisted his right knee while descending a five foot wooden ladder resting upon boards placed in the sand between the gangway of the HULDA after crossing from the SILVER HAWK to the HULDA in an effort to reach the ground after the hurricane had abated. Patrick had been picked up at a barroom in Gulfport during the evening of the hurricane by an assistant engineer from the SILVER HAWK after he by his own admission had consumed four or five beers. He slept from about 9:30 P.M. on the night of August 17 during the hurricane until the ship had holed herself on the dock at which time he was called at approximately 11:00 P.M. to assist in shutting down the plant during the height of the hurricane. He admitted that the lower level was flooded with water and oil and that those seamen who left that level had crossed near the area where he subsequently slipped; also, that if he had been looking he would have seen the oil on which he slipped and which it was partly his responsibility as an oiler to keep wiped or cleaned up. This ladder in question was established to be a safe and steady means of descent from the gangway of the HULDA to the ground which was five feet away and was traversed by many other seamen and by Captain Jennings of the Maritime Service many times subsequent to the hurricane all without incident or injury. Although Patrick testified herein that he complained on the night in question to the Third Engineer Frank Hickock about his slip in the main engine

8. See Exhibit D–1, the only defense exhibit offered into evidence in this entire trial.

room, nevertheless he admitted in his prior deposition that he made no complaint of any of these incidents or injuries to anyone until he employed an attorney many months later to file his claim in a Texas State Court.. He admitted that he was examined by a doctor approximately one month subsequent to his alleged injuries, was found fit for duty and signed aboard two other ships; and at no time did he complain to medical authorities or anyone else, including anyone connected with the SILVER HAWK, about his injuries. Approximately seven months subsequent to the hurricane, in March 1970, his right knee locked and he reported to a hospital in Galveston, Texas from the ship on which he was a crewman and underwent an operation on the right knee on April 1 or 2, 1970. He admitted that he did not tell the medical authorities who examined him and operated on him that he injured his knee on the SILVER HAWK, but that when the doctor asked if he hurt his knee on "the ship" he said yes, although he was a crewman aboard another ship at the time that he first sought medical attention for any injury to his right knee. It was his further testimony that his knee does not cause him much pain and his injury and resulting operation are not disabling.

### 27.

India Supply Mission, the owner of the cargo of urea aboard the SS HULDA, has filed its claim herein against her owner, The International Marine Development Corporation in Civil Action No. 3878 for the costs and expense of claimant being required to unload the cargo from the HULDA and reload it aboard another vessel, upon which it was shipped to its original destination. The petitioner, International Marine, and the claimant, India Supply Mission, stipulated at the beginning of this trial that all exhibits attached to the Motion for Summary Judgment previously filed herein by the cargo claimant and overruled by this Court for the reasons stated in a previous Memorandum Opinion filed herein, should be considered to be received in evidence in this case, which stipulation the Court accepted. It was also stipulated that all of the claims of India Supply were predicated on acts, failure to act, or events subsequent to Hurricane Camille and that the weather conditions on the Mississippi Gulf Coast for the next few days and months following Camille in no way would or did interfere with or prevent unloading of this cargo by anyone. In substance, the exhibits attached to the Motion for Summary Judgment show that International Marine Development refused to unload this cargo although it protected it, which is evidenced by the fact that it was undamaged and there was no loss or diminishment in the value thereof while aboard the vessel while beached at the Gulfport Harbor as a result of Camille. International Marine contends that it was the duty and responsibility of the claimant to unload pursuant to the private Charter Party Agreement entered into between petitioner and claimant concerning the loading, transportation and unloading of this cargo, which was ultimately unloaded by the cargo owner, India, pursuant to the demands of the Mississippi State Port Authority which administered the Port of Gulfport. There is no reference in this Charter Party Agreement to the Carriage of Goods by Sea Act or any agreement therein that any provisions of the COGSA would control or apply. There were no bills of lading issued, but mates' receipts were given for the cargo which consisted solely of the urea owned by the claimant, India Supply. Accordingly, the carriage was entirely private and not a common carriage, and provided in part that the cargo should be "unloaded, stowed, trimmed and discharged by the charterers free of risk and expense to the vessel". There is no evidence that the mates' receipts had been negotiated to a third party and that they were not still in possession of the charterer, and there was no evidence adduced by the claimant that any freight was paid to the owner of the HULDA by the charterer,

India Supply, for the carriage of the cargo of urea, whether in the form of freight or charter hire. The charterer, India Supply, by stipulation herein expressly agreed that the owner of the HULDA was in no way at fault in her being stranded on the beach by Hurricane Camille.

## CONCLUSIONS OF LAW

### 1.

█ Jurisdiction and venue are conceded except that Bennett Patrick, the personal injury claimant against the owner of the SILVER HAWK, had previously requested to withdraw from this proceeding and pursue his claim in the Texas State Court which request was overruled by this Court although it has previously permitted him to file his claim subsequent to the time prescribed for the filing thereof and overruled the Motion of International Marine Development Corporation for Summary Judgment based on said late filing. Furthermore, the Court has previously permitted him to amend his claim as well as his Answer but has denied his request that the limitation fund be increased to $60.00 per ton for each injury which he complained of. At the time that the petitioners herein rested their cases, the claimant Bennett Patrick moved to exclude the evidence and for a judgment in his favor against the owner of the SILVER HAWK, International Marine Development Corporation in Civil Action No. 3878. The Court reserved ruling on this Motion and now overrules.

### 2.

█ The owners of the three vessels in question in these three cases, the SS HULDA, the SS SILVER HAWK and the SS ALAMO VICTORY have shown by a preponderance of the evidence here-

in that the sole proximate cause of these vessels coming adrift and causing damage to the facilities of the claimants, Martin, d/b/a Port Marine Supply, as well as the damage to all three of the vessels in question was the unprecedented, catastrophic phenomenon of Hurricane Camille, the most intense hurricane to ever strike the North American continent with the fury, power and destructiveness constituting a freak of nature almost beyond human comprehension, rather than any negligence in mooring the vessels, and that there was no negligence on the part of either of the owners or Masters of any of these vessels which proximately caused or proximately contributed to cause their coming adrift, striking each other, injuring any claimants herein or causing damage to the facilities of the Martins.[9]

### 3.

██ Although the Court recognizes that a moving vessel must show that her drifting was a result of an inevitable accident or a *vis major,* which human skill and precaution and a proper display of nautical skill could not have prevented, and that the burden of proving inevitable accident or Act of God rests heavily upon the vessel asserting such defense,[10] the Court finds that under the facts and circumstances of this case the defendants have overcome the adverse presumption attaching for collisions caused by all three of the moving vessels in question and have thus met and successfully carried their heavy burden of proof.[11]

### 4.

█ Hurricane Camille, which was the greatest natural disaster in the history of the North American continent and caused more devastation and de-

9. The Petition of the United States, 300 F.Supp. 358 (E.D.La.1969) affd., 425 F.2d 991 (C.A.5, 1970).

10. See The Petition of the United States, 425 F.2d 991, 995 (C.A.5, 1960; Boudin

v. J. Ray McDermott & Company, 281 F.2d 81, 88 (C.A.5, 1960).

11. See The Petition of the United States, 300 F.Supp. 358, 366 and cases cited in fn. 1 on page 366.

struction to the Mississippi Gulf Coast area and to the North American continent than any hurricane of record, with unprecedented wind velocity in excess of 200 miles per hour, a tide rise of 30 feet or more, and a tidal surge of at least 22 feet, is the most classic case and striking example of what is characterized as an Act of God. This freak of nature was of sufficient velocity and destructiveness to overcome all reasonable preparations, which the Court finds were made by the Masters and crews of all three of the vessels in question, and the defense of *force majeure* is sustained.[12]

5.

■ The Court further finds that the petitioners have shown by a preponderance of the evidence that not only were the preparations taken by those responsible for the SS HULDA, SS SILVER HAWK and SS ALAMO VICTORY reasonable, in that they were those of prudent men familiar with the ways and vagaries of the sea and in reasonable anticipation of the severity of the impending storm, but that the decision of the Masters of these three vessels, which was without the knowledge or privity of the owners thereof, to remain in Port at Gulfport rather than put out to sea, under all the circumstances then prevailing was reasonable and proper and were the reasonable and correct judgments and decisions of prudent men familiar with the ways and vagaries of the sea and their anticipation of the severity of the impending hurricane.

6.

■ The Court further finds that none of the claimants in any of these three cases has met his burden of proving by a preponderance of the evidence that those in charge of any of the three vessels were negligent or that any of the three vessels were unseaworthy, and no liability arises to any of the claimants in any of these three cases on the part of all three shipowners, who are entitled to exoneration from liability to any and all of the claimants in each of these cases pursuant to 46 U.S.C.A. §§ 181–189.

7.

In any event, none of the claimants herein has proved his or its claim by a preponderance of the evidence, including the claims of any of the shipowners against the others, the claims of the personal injury claimants or the claims of those who allegedly suffered property damage.

8.

■■ Under private charter parties, the terms and agreements of the parties may be adjusted in any manner specified by the charter.[13] In this private agreement, International Marine Development Corporation, owner of the SS HULDA, and the claimant cargo owner, India Supply Mission, agreed that it was the charterer's obligation to "load and discharge the cargo free of expense" to the vessel, and this agreement is legal and binding upon the claimant, particularly in view of the fact it stipulated that the HULDA was beached through no fault or negligence of those responsible for its safety or welfare, including the Master thereof, and in view of the fact that the cargo was protected and undamaged. Therefore the claimant, India Supply Mission, has failed to prove that the Carriage of Goods by Sea Act is applicable or that the International Marine Development Corporation is in any way liable or responsible to it for its cost of unloading the cargo from the HULDA or any other costs in connection therewith, and is not entitled to recover therefor in Cause No. 3878.

9.

Therefore, let a Judgment be prepared and presented to this Court pursuant to

---

12. The Petition of the United States, *supra*, and all cases cited in fn. 2 thereof at 300 F.Supp. 366.

13. Coastal States Petrochemical Co. v. Montpelier Tanker Co., et al., 321 F. Supp. 212, 219 (S.D.Tex., 1970).

the Local Rules, approved as to form by all appropriate parties:

(1) In Civil Action No. 3878, granting exoneration from liability of International Marine Development Corporation, as owner of the SS HULDA, and dismissing all claims filed against it at claimants' costs;

(2) In Civil Action No. 3879, granting exoneration from liability of the Oneida Steamship Company, Inc., as owner of the SS SILVER HAWK and dismissing all claims filed against it at the claimants' costs;

(3) In Civil Action No. 3992 granting exoneration from liability of the United States of America as owner of the SS ALAMO VICTORY, dismissing all claims filed against it at the claimants' costs.