Petition of the UNITED STATES of America, as owner of the SS WINGED ARROW, for exoneration from or limitation of liability.

DAMMERS & VAN DER HEIDE SHIPPING & TRADING (ANTILLES) INC., as owner of the MV SANTA MARIA

v.

The STEAMSHIP JOSEPH LYKES, her engines, etc., in rem and Lykes Bros. Steamship Co., Inc., in personam, et al.

CENTRAL GULF STEAMSHIP CORPORATION, as owner of the SS GREEN PORT

v.

LYKES BROS. STEAMSHIP COMPANY, Inc. and the SS Joseph Lykes.

CENTRAL GULF STEAMSHIP CORPORATION, as owner of the SS Green Port

v.

The UNITED STATES ARMY BARGES and the United States of America.

MARINE TANKERS, INC., as owner of the MT SAVFUEL

v.

SS JOSEPH LYKES, her engines, etc., in rem, and Lykes Bros. Steamship Co., Inc., in personam.

HAMBURG–SUDAMERIK. DAMPF-SCHIFF.–GES. Eggert & Amsinck, as owner of the SANTA ISABEL

v.

LYKES BROS. STEAMSHIP CO., Inc., et al.

No. 8036, Civ. A. Nos. 66–289, 66–315, 66–316, 66–325, 66–327.

United States District Court
E. D. Louisiana,
New Orleans Division.

April 11, 1969.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert B. Acomb, Jr., Frank C. Allen, Jr., New Orleans, La., for Central Gulf Steamship Corp.

Edmond C. Salassi, New Orleans, La., for Marine Tankers, Inc. and the M/T. Savfuel.

Phelps, Dunbar, Marks, Claverie & Sims, James Hanemann, Jr., New Orleans, La., for Hamburg-Sudamerik. Dampfschiff.-Ges. Eggert & Amsinck and the Santa Isabel.

George W. Healy, III, New Orleans, La., for Thomas Jordan, Inc.

Thomas J. Boyle, Admiralty & Shipping Section, U. S. Dept. of Justice, Montgomery, Barnett, Brown & Read, John B. Gooch, Jr., New Orleans, La., for National Marine Service, Inc., and the Barge LTC–22.

Terriberry, Rault, Carroll, Yancey & Farrell, Alfred M. Farrell, Jr., New Orleans, La., for S/S Joseph Lykes, and Lykes Bros. Steamship Co., Inc.

CASSIBRY, District Judge:

## FINDINGS OF FACT

1.

These consolidated actions arose out of Hurricane Betsy which struck the port of New Orleans on the night of September 9th and early morning of September 10, 1965. Owners of various moored vessels, which were damaged as a result of the breakaway of others, contend that the owners of the SS JOSEPH LYKES, SS WINGED ARROW and the United States Army barges were negligent in preparing for the hurricane, in mooring the vessels, and have not overcome the presumption of fault for striking stationary objects.

2.

The plaintiffs against Lykes Bros. Steamship Co., Inc., and its SS JOSEPH LYKES are Central Gulf Steamship Corp., owner of the SS GREEN PORT, Dammers & Van der Heide Shipping & Trading (Antilles), Inc., owner of the MV SANTA MARIA, and Marine Tankers, Inc., owner of the motor tanker SAVFUEL. Claiming against the United States as owner of a number of Army barges are the owners of the GREEN PORT and SANTA MARIA. The owners of the GREEN PORT together with National Marine Service, Inc., also claimed against the government as owner of the SS WINGED ARROW. The SANTA MARIA's action joined as co-defendant the aforementioned National Marine Service, Inc., as owner of various barges which also broke adrift, and National, in turn, cross-claimed for its own damages and contingent liability against Lykes and the government. Other claims were withdrawn at trial.

3.

The complaint of Central Gulf Steamship Corp. contends as well for high order salvage against the JOSEPH LYKES for $2 million and claims salvage against the government for the Army barges.

**4.**

The many principal witnesses were heard in open court and several depositions were received in evidence. The Weather Bureau data and all meteorologic and hydrologic phenomenon regarding Betsy were stipulated as compiled in the Public Report, November, 1965, serial number 1794, United States Army, District of New Orleans, Corps of Engineers. The records of the Board of Commissioners, Port of New Orleans, were received as well as innumerable exhibits and photographs.

**5.**

On the early morning of September 8th, Betsy had lashed southern Florida with peak wind gusts up to 105 m. p. h., causing tidal flooding and considerable damage in the Miami area. Continuing westward, the hurricane swept over the Upper Keys that night when winds reached 140 m. p. h. As the hurricane entered the Gulf, her track was uncertain, moving generally WNW'ly. On the afternoon of September 8th, security preparations went forward in the port of New Orleans, the hurricane then being some 450 miles away.

**6.**

The JOSEPH LYKES, built in 1960, of the "Gulf Pride" class is 495' in length and 60' in beam. At the relevant times, in her lightened state, she drew 9' 08" forward and 19' 06" aft. The JOSEPH LYKES, moored starboard side to, bow upriver at the Andry Street Wharf, along the left descending side of the river, had been laid up at the repair facility of Dixie Machine Welding and Metal Works, Inc., out of commission, and without a crew. On August 23rd, major dismantling work began under the supervision of the owner's port engineers. The vessel's main engine and auxiliaries were disassembled. A Lykes' chief engineer and first assistant engineer were aboard during the work days. The machinery was the subject of examination by the Coast Guard and the American Bureau of Shipping during the required quadrennial survey. The JOSEPH LYKES, a "dead ship" was wholly without power, electricity being furnished a shoreline by Dixie. In connection with Lykes' long-range maintenance program, the JOSEPH LYKES' hull was being sand blasted. Her deck machinery, cargo winches, and anchor windlass had all been removed ashore for sand blasting. The unusable anchors led out just below the hawse pipes, stopped off by wire cable through the chain links and around bitts. Third Officer Eugene F. McCormick was aboard each working day beginning September 1st. On September 8th, her master, Captain John A. Madison, rejoined the ship.

**7.**

On the afternoon of September 8th, at the direction of the owner's port captains, regular members of the Lykes shoregang reported to the JOSEPH LYKES and others in the fleet, to put out additional mooring lines. These men, based ashore, were sailors of years experience, certificated by the Coast Guard for the ratings of boatswain and able-bodied seamen. By 4 p. m., and when the shoregang departed, the JOSEPH LYKES had out five headlines, two forward breast lines, one forward spring line, four back spring lines, and four stern lines. They were 8-inch manila lines, some broken out of the gear locker and used for the first time.

**8.**

The WINGED ARROW, which was formerly named the GREEN BAY, is a 460 foot long vessel of the C2 class. She had once been owned by plaintiff-claimant Central Gulf but had since been traded to the government and then re-delivered to Central Gulf in an arrangement whereby Central Gulf would act as a general agent for the government. On the morning of September 8, 1965 the vessel's main turbines were being warmed up preparatory to departure from New Orleans on her first voyage as a general agency vessel with the name

WINGED ARROW. During the engine warm-up, difficulties were encountered that postponed the scheduled September 8 departure and required that the vessel remain at Charbonnet Street, where she had been for the past month, undergoing repairs and various inspections (one of which was an anchor chain inspection, wherein the American Bureau of Shipping certified the soundness of both anchor chains).

### 9.

On the morning of September 9th at 8 a. m., the Dixie Machine repair workers boarded the JOSEPH LYKES and resumed sand blasting the hull. That morning hurricane warnings were issued from the mouth of the Mississippi River westward to Galveston. In the afternoon, Betsy's rate of advance up the Gulf had increased to 12 m. p. h. The storm was intensifying and its track changed from WNW'ly to NW'ly. Lykes again sent members of the shore-gang to the JOSEPH LYKES. Beginning at 1 p. m. they put out additional lines ultimately filling each of the ship's bitts and bollards with the maximum load of 8-inch mooring lines. In all, counting bights and leads of the double lines, there was a total of 30 leads to the steel cleats and bollards on the Andry Street Wharf. In the rainy weather, the repair yard workers knocked off at 3:30 p. m., shortly after the shoregang left.

### 10.

The government barges involved in these cases are Army cargo barges which are shuttled back and forth across the Mississippi River by commercial tugs. While not in use the majority of these barges remain moored at the Navy Base moorings on the west bank of the river. They are towed across to the Army terminal on the east bank (at Poland St.) when and if they are needed in the handling of Army cargo. The Army's entire cargo barge fleet at New Orleans on September 9, 1965 consisted of some 27 barges about 120 feet long by 30 or 40 feet wide and one barge (BCL–1104) about 220 feet long. Five of these cargo barges were permanently moored at the Army Terminal, while, as of September 9, 1965, the remaining 22 had been placed at the Navy's West Bank Moorings.

### 11.

The National Marine Services barges were moored upriver of the Army barges on the west bank less than a mile away. Three tank barges were present: the LTC 22, 195 feet in length, the LTC 47, 210 feet in length, and the LTC 31, 200 feet in length. By the early afternoon of September 9, 1965, additional moorings had been placed on each of these barges by the crew of the National Marine Services tug CRESCENT CITIES. When the additional moorings were completed, the LTC 47 had 6 bights of 1½" diameter polyethylene line from her bow to some shoreside pilings and four bights of the same from her stern to another group of pilings; the LTC 22 was outboard of the 47 with 4 bights each of 1½" polyethylene line to the bow and stern of the 47, together with a 1" cable running from the center of the 22 to another cluster of pilings on the shore. The LTC 31 was separately moored upstream of the other two with a ⅞" cable running from a cluster of pilings to a bitt amidships, together with 4 bights of 1½" polyethylene to a cluster of pilings at her bow and 4 bights of 2" diameter Manila line at her stern to another cluster of pilings. The CRESCENT CITIES remained alongside the LTC 22 until well after 10 p. m. and her crew observed that the moorings of all three tank barges were adequate as against the hurricane forces.

### 12.

By 3 p. m. on the afternoon of September 9, the WINGED ARROW crew had completed the additional moorings ordered by the Government's Maritime Administration when it appeared likely that the vessel would have to ride out a hurricane at her Charbonnet Street

moorings. The WINGED ARROW's mooring arrangement consisted of two 1¼″ wire cables, one forward and one aft, and between 14 and 20 manila and synthetic lines to each available bollard on the wharf. On the evening of September 9, from 8 p. m. on, the Captain of the WINGED ARROW, a man who had sailed ocean-going ships for 17 years and had weathered four previous hurricanes, personally and periodically (up to 9:50 p. m.) inspected his ship's lines and was satisfied that they had an even strain and were sufficient for the impending hurricane.

### 13.

Also, by the afternoon of September 9, the moorings of the Army barges had been strengthened by additional lines put out that morning by a crew supervised by an Army sergeant acting under the directions of the Army Contracting Officer at the Army Terminal. When the barge mooring arrangement had been completed, it consisted of at least six parts of 6-inch manila line at each end of each barge running on each side to either the wharf or the next adjacent barge in the tier, each tier containing no more than four barges. This arrangement was periodically inspected by Navy officers on duty on the night of September 9 and found to be sufficient for the impending hurricane.

### 14.

The SS GREEN PORT, fully loaded to a draft of about 27 feet and with deck cargo, was scheduled to depart the Army base at New Orleans via the Mississippi River to the Gulf for a foreign voyage on the morning of September 9th. Instead her master and owners thought it best to remain in port in view of the hurricane warnings. Shortly after 4 p. m., the GREEN PORT shifted to Central Gulf's regular berth and made up starboard side, bow upriver, to the Bienville Street Wharf where her lines were doubled in anticipation of riding out the storm. Ahead was the small tanker SAVFUEL, portside to Bienville Street Wharf. Astern of the GREEN PORT, and starboard side to at Toulouse Street Wharf, was moored the SANTA MARIA. The foregoing three vessels of plaintiffs, and several others were moored in the bend of the river across from Algiers Point, where the river, in downstream flow, makes a pronounced turn from north around to east.

### 15.

During the late afternoon, September 9th, Lykes' Port Captain ordered five members of the shoregang to return aboard the JOSEPH LYKES to man the ship, and to assist Captain Madison and Mr. McCormick as security watch. The shoregang's seamen Stickell, Harris, Russell and Mulkey came aboard at 5:30 p. m., and Sloot, who had gone home, arrived later. There was a watchman aboard as well as the two officers. That evening the weather worsened continually. By 9:30 p. m., peak gusts reached an estimated 100 m. p. h. Thereafter the wind was constant and increasing in velocity. Captain Madison and one other seaman patrolled the main deck and the wharf in checking the moorings. The lines were holding well and under an even strain.

### 16.

Meanwhile the river was rising abnormally and quickly. A rise of 3.6 feet was recorded between 9 and 10 p. m. in the harbor, the river reaching an elevation of 12.4 feet at midnight. It was accompanied by a remarkable phenomenon of a tidal surge running upriver (against the normal current) and with an estimated velocity of over 20 m. p. h. The effects of the tidal surge from the river's mouth were to be felt for 400 miles upriver. Below New Orleans, there was a massive overtopping of the west and east bank levees. Lower river communities were inundated, as ultimately was the lower section of the city below the Industrial Canal. In the port by 10 p. m. and continuing, the winds, from NE moving clockwise to ENE, far exceeded hurri-

cane force. Estimates of the velocity varied between 120 and 150 m. p. h. Instruments had given way ashore and were afloat. Driving rains and blackened sky reduced visibility. Metal debris and shed tops from the wharves hurled about. The wind, moving clockwise, played on the starboard beams and quarters of the JOSEPH LYKES and WINGED ARROW. Conversely the ENE wind at Algiers Bend was from offshore and held plaintiffs' and other vessels moored there onto the docks.

### 17.

Shortly after 10 p. m. and when shore-gang seaman Sloot was patrolling the dock off the forward section of the JOSEPH LYKES, two or more dock bollards, used in common by stern leads of the JOSEPH LYKES and bow leads of the WINGED ARROW, tore loose from their cement foundations under the immense strain. A chain reaction followed. As the two ships' bow and stern lines respectively came free of the ruptured dock bollards, the stern of the JOSEPH LYKES and the bow of the WINGED ARROW fell free and out into the river. The even strain on the vessels' lines was destroyed and the rest of the moorings quickly severed. The JOSEPH LYKES was literally blown offshore and taken upriver. The WINGED ARROW let go both anchors but each chain gave way under the compulsion of the force of the wind and tidal surge on the deadweight of the vessel.

### 18.

The JOSEPH LYKES, sailing with the hurricane wind and tidal surge, instantly gathered speed. She was driven, bow first, upriver and diagonally across. The speed of the "dead" ship was estimated by her officers at more than 20 m. p. h., faster than her designed full speed at sea. In a short while the JOSEPH LYKES was taken along the opposite, right descending (Algiers) bank where she contacted and raked moored barges, tugs, and nondescript craft. Those aboard the JOSEPH LYKES, gave in-effectual warnings by hand flashlights and shouting. Their identification of the craft which were struck was impossible under the conditions. It is likely that first contact was made with the nest of Army barges at the Naval Base above Todd Shipyard Corp. and moored upriver from the USS HYMAN and the USNS KELLER.

### 19.

Meanwhile the WINGED ARROW, driven in the same diagonal path, struck a moored submarine astern of the HYMAN, thereafter colliding with both the HYMAN and the KELLER, before coming onto the Army barges where additional contact ensued. The Army barges, having already been struck by the JOSEPH LYKES, had either been set adrift or were thereupon set adrift by the second collision.

### 20.

The JOSEPH LYKES, followed by the WINGED ARROW, raked along the bank contacting various craft not involved in the litigation, including those at Smith's Fleet. Thereafter, and at the next wharf, (Shell), the barge LTC–22, outboard of the LTC–47, was struck and each set adrift by the JOSEPH LYKES. Then the LTC–31 was struck and set adrift by the WINGED ARROW. These three barges were owned by National Marine Service, Inc. By this time, the river was filled with drifting marine equipment, including four merchant ships, a floating crane and even a drydock carrying a vessel within.

### 21.

The JOSEPH LYKES having now arrived off Algiers Point, was driven by the wind and tidal surge across into the bend, as were the barges. The ship fetched up, bow on, momentarily, at the open section of Dumaine Street, where more barges were raked. She then swung upriver, stern first, striking the SANTA MARIA at Toulouse Street Wharf. The JOSEPH LYKES' officers and men were pulling in the severed

mooring lines, making ready for an opportunity to get a line over. The JOSEPH LYKES continued stern first upriver to Bienville Street Wharf, where she heavily raked the whole port side of the GREEN PORT, carrying away the moored vessel's port lifeboat, imbedded in the JOSEPH LYKES' bow. The JOSEPH LYKES having been slowed, the two ships' wreckage remained in contact with the JOSEPH LYKES' port bow overlapping that of the GREEN PORT, until the next collision. The collision with the GREEN PORT, momentarily halting the JOSEPH LYKES, was logged by the GREEN PORT's night mate at 10:30 p. m.

## 22.

Captain Madison sent three of the JOSEPH LYKES' men down to the GREEN PORT's bow in the hope of securing his vessel. Mulkey was the first to climb down the remnants of the GREEN PORT's lifeboat protruding from the JOSEPH LYKES' port bow. He was followed by Stickell and Harris. The bow stood high out of the water, more than 10 feet above the raised forecastle head of the deeply loaded GREEN PORT. Attempts were made by the Captain and Third-Mate McCormick to pass a line down.

## 23.

It is uncertain whether one or more of the JOSEPH LYKES' lines were actually made fast to the GREEN PORT. The officers believe one was. However, the situation was *in extremis*, the men working under hazardous conditions in driving rain. The GREEN PORT's bitts were completely filled with her own lines. The three men who had boarded the GREEN PORT, did in fact secure a bight of one of that vessel's nylon lines, tieing it to a heaving line thrown down from the JOSEPH LYKES. It lead to a drum of the winch on the GREEN PORT'S forecastle head and, having been hauled aboard the JOSEPH LYKES, was made fast at her bow.

## 24.

After temporarily securing their vessel, Mulkey, Stickell and Harris made their way down the ladder of the GREEN PORT's forecastle head, along the main deck, over her deck cargo, in working their way aft. They lost contact with one another. Stickell went to the GREEN PORT's brow type gangway which overhung the dock. He made fast a line to the brow and slid down to the Bienville Street Wharf. He boarded the small tanker SAVFUEL, berthed ahead of the GREEN PORT and inboard of the JOSEPH LYKES, intending to run lines from his ship to the wharf. Captain Madison, Third-Mate McCormick and seaman Russell were readying lines when they saw the WINGED ARROW approaching bow-on the starboard side of the JOSEPH LYKES, at a right angle and took cover.

## 25.

The WINGED ARROW rammed the JOSEPH LYKES just forward of her bridge, then swung about, bow upriver. The WINGED ARROWS's stern and after section of her starboard side swung about and struck the GREEN PORT's hull. The GREEN PORT's night mate had sounded the general alarm on the approach of the WINGED ARROW at 10:50 p. m. He logged the collision of the WINGED ARROW with the GREEN PORT at 10:55 p. m. The earlier bow-on striking by the WINGED ARROW of the starboard side of the JOSEPH LYKES caused the latter to dislodge from the GREEN PORT's bow and the line or lines, earlier made fast by the JOSEPH LYKES' men, gave way under the impact. The JOSEPH LYKES fell upriver and against the small tanker SAVFUEL where she was held by the on-shore hurricane wind on her starboard beam. The WINGED ARROW, overlapping the GREEN PORT, was pressed inshore by the wind. The WINGED ARROW was made fast to the GREEN PORT's starboard side with the assistance of the latter's crew under the

direction of the GREEN PORT's chief officer and boatswain.

### 26.

Before and during the foregoing occurrences, various barges involved in the litigation did in fact nest and pound against the moored vessels of plaintiffs.

### 27.

Assisted by the on-shore wind, those on the JOSEPH LYKES were able to get a heaving line and a mooring line across to Stickell on the SAVFUEL and then to the Bienville Street Wharf. More lines were led out from the JOSEPH LYKES and made fast ashore. All of the vessels involved rode out the hurricane, which continued beyond midnight, in the positions mentioned above.

### 28.

With respect to the salvage claim by the GREEN PORT's owner against the JOSEPH LYKES, the weight of the evidence shows that no one of the GREEN PORT's crew handled a single line between the GREEN PORT and the JOSEPH LYKES during the time that their bows were lodged together, nor later, when the JOSEPH LYKES was knocked loose by the WINGED ARROW, and was then made fast to the dock by her own lines, handled by her officers and crew. Captain Reisvaag, master of the GREEN PORT, testified that he had first gone up to her bow after the JOSEPH LYKES had struck. He then went ashore to report the collision on the telephone, where he was when the WINGED ARROW collided. While at the bow the Captain said he saw two or more unidentified men handling lines and assumed they were of his crew. The conditions were *in extremis* with howling winds in excess of 120 m. p. h., driving rain, impaired visibility and dangerous debris and shed tops flying about. In fact one of the GREEN PORT's officers had come down from the bridge but decided against following the Captain forward and returned to safety. Understandably distraught, the Captain was unable to describe exactly what his own activities were at the bow. It is clear that the two or more men he saw there were Mulkey, Stickell and Harris from the JOSEPH LYKES. Significantly, no individual of the GREEN PORT's crew has ever come forward to report an alleged act of salvage to the JOSEPH LYKES. In fact neither the master, chief officer, or boatswain were aware of the owners' suit for salvage until the giving of their testimony, some three years after Betsy.

### 29.

With respect to the salvage claim by the GREEN PORT's owner against the Army barges, there is no evidence that any member of the GREEN PORT crew handled any lines to these barges, or, for that matter, performed any act whose purpose was the securing or salving of said barges.

## CONCLUSIONS OF LAW

### 1.

Jurisdiction and venue are conceded except that the United States objects to the jurisdiction of the court over the Government in CA 66–289. Government's objection is overruled.

### 2.

The owners of the JOSEPH LYKES and WINGED ARROW have shown by a preponderance of the evidence that the proximate cause of those vessels coming adrift and causing damage was the unprecedented and catastrophic phenomenon of Hurricane Betsy, rather than negligence in mooring. The barges' owners have shown that, while moored across the river, the barges were struck and caused to come adrift with consequent damage by the two run-away, helpless ships.

**3.**

■ The defendants have overcome the adverse presumption attaching for collisions with properly moored vessels.[1]

**4.**

Betsy, which caused more devastation in New Orleans and to the marine community than any hurricane of record, with unprecedented wind velocity, tidal rise and upriver tidal surge, is a classic case of an act of God. The forces of nature, being sufficient to overcome all reasonable preparations, the defense of *force majeure* is sustained.[2]

**5.**

■ The claim for high order salvage against the JOSEPH LYKES by the owner of the GREEN PORT falls for want of proof, as found in Findings numbered 28. The fact that the moored GREEN PORT was unavoidably struck by the JOSEPH LYKES, whose progress upriver was thereby momentarily checked, does not in itself, make out a case of salvage by the moored ship's owner, officers and crew. For the owner and those aboard to be entitled to salvage there must have been a subsequent voluntary act of assistance or service rendered to the ship in need.[3] The evidence discloses no such service by those on the GREEN PORT, as the JOSEPH LYKES was twice made fast by her own officers and men.

**6.**

■ Likewise, the claim for high order salvage against the Government fails for want of proof as found in Finding Number 29. The evidence discloses no voluntary act of salvage service rendered to these barges by anyone in the crew of the SS GREEN PORT or by anyone else on whose behalf plaintiff Central Gulf could claim salvage.

**7.**

Let a judgment be prepared: (1) in Admiralty No. 8036, granting exoneration from liability of the United States as owner of the SS WINGED ARROW and dismissing the claims against it at claimants' costs; (2) in Civil Action No. 66–289, dismissing the action of Dammers & Van der Heide Shipping & Trading (Antilles), Inc., as owner of the SS SANTA MARIA and all cross-claims therein, at plaintiff's costs; (3) in Civil Action No. 66–315, dismissing the action of Central Gulf Steamship Corp. as owner of the SS GREEN PORT against the SS JOSEPH LYKES at plaintiff's costs; (4) in Civil Action No. 66–316, dismissing the action of Central Gulf Steamship Corp. against the United States as owner of Army barges, and all third-party claims therein, at plaintiff's costs; (5) in Civil Action No. 66–325, dismissing the action of Marine Tankers, Inc., as owner of the MT SAVFUEL at plaintiff's costs.[4]

1. The Louisiana, 3 Wall. 164, 18 L.Ed. 85 (1866); Boudoin v. J. Ray McDermott & Co., 281 F.2d 81 (5th Cir. 1960); Patapsco Scrap Corp. v. Maryland Shipbuilding & Drydock Co., 268 F.2d 817 (4th Cir. 1959).

2. United Geophysical Co., Inc. v. Vela, 231 F.2d 816 (5th Cir. 1956); Massman-Drake et al. v. Towboat MV Hugh C. Blaske et al. (Hurricane Betsy) 289 F.Supp. 700 (E.D.La.1968); Atlanta—Schiffahrts et al. v. United States of America (Hurricane Betsy) C.A. No. 66–257, Section "D" (E.D.La., February 20, 1969, not yet reported); Twery v. Houseboat Jilly's Yen (Hurricane Betsy), 267 F.Supp. 722 (S.D.Fla.1967); Compania de Vapores Insco S. A. v. Missouri Pacific R.R. Co., 232 F.2d 657 (5th Cir. 1956); Sinclair Nav. Co. v. Steamship Steel Voyager, 1925 A.M.C. 1030 (E.D.La.1925); New York & Cuba Mail S.S. Co. v. United States, 1936 A.M.C. 1271 (E.D.N.Y.1936); Tug Mary T. Tracy Lim. Procs., 8 F.2d 591 (2nd Cir. 1925); The Law of Admiralty by Gilmore and Black (1957) Ch. VII, p. 396.

3. The Law of Salvage by Norris, (1958) p. 24, § 15.

4. Civil Action No. 66–327 was dismissed during the course of the trial.