In the Matter of **MARINE LEASING SERVICES, INC.,** and Pittsburgh Plate Glass Company, praying for exoneration from or limitation of liability.

**No. 869.**

United States District Court,
E. D. Louisiana,
Baton Rouge Division.
June 25, 1971.

J. Y. Gilmore, Jr., Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for Marine Leasing Services, Inc., Niagara Fire Ins. Co., and Employers Liability Assurance Corp., Ltd.

David F. Kaliner, Philadelphia, Pa., for Marine Leasing Services, Inc.

Robert B. Acomb, Jr., Robert Contois, Jr., Jones, Walker, Waechter, Pointevent, Carrere & Denegre, New Orleans, La., for Pittsburgh Plate Glass Co. and Travelers Insurance Co.

George B. Matthews, George A. Frilot, III, Donald A. Hoffman, Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., for Cargo Carriers, Inc.

Thomas F. McGovern, Anthony W. Gross, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., Joseph A. Towers, District Counsel, U. S. Army Corps of Engineers, New Orleans,

La., Gerald J. Gallinghouse, U. S. Atty., E. D. of Louisiana, James Carriere, Asst. U. S. Atty., E. D. of Louisiana, New Orleans, La., for United States of America.

William P. Hepburn, Annapolis, Md., for American Motorists Ins. Co.

WEST, Chief Judge:

On September 10, 1965 Hurricane Betsy, in all her fury, struck the Port of Baton Rouge, Louisiana. She was described at the time as probably the most destructive hurricane of modern times. Barges, tugboats, and other vessels were destroyed by the hundreds between the Ports of Baton Rouge and New Orleans. One such vessel was the barge MTC–602, laden with 600 tons of liquid chlorine. After the sinking of the barge, the United States of America expended large sums of money to first locate and mark the sunken vessel and then to raise it and dispose of the chlorine and the remains of the vessel. The United States now seeks recovery of these costs from the owner and charterer of the barge. In support of the conclusion that the United States is entitled only to recovery of costs incurred in locating and marking the sunken vessel, and that these costs should be recovered from the charterer of the barge, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

*The Parties*

(1) Petitioners Marine Leasing Services, Inc. (Marine Leasing) and Pittsburgh Plate Glass Company (PPG) petitioned this Court for exoneration from, or limitation of liability for, any claims arising out of the sinking of the loaded chlorine barge MTC–602 in the vicinity of Baton Rouge, Louisiana, near the east bank of the Mississippi River at approximately mile 227 during Hurricane Betsy on September 9 and 10, 1965.

(2) The United States of America filed such a claim, asking for recovery from Marine Leasing and PPG of all costs of removing the sunken MTC–602, the costs of locating and buoying the barge, statutory penalties, and all other related costs.

(3) PPG was the manufacturer, seller, and shipper of the chlorine cargo aboard the MTC–602 as well as the bareboat charterer of the barge at the time it sank.

(4) Marine Leasing was the owner of the MTC–602 at the time of its sinking.

(5) Marine Leasing and PPG, seeking indemnity in the event the United States should be successful in its claim, joined Cargo Carriers as a third party defendant, alleging that it was Cargo Carriers' negligence in not properly attending the MTC–602 that was the proximate cause of the sinking.

(6) Cargo Carriers, Inc. (Cargo Carriers) operated a fleeting facility in Port Allen, Louisiana located on the west side of the Mississippi River, and the MTC–602 was moored in the Cargo Carriers' fleet area, known as LSU Fleet No. 9, for wharfinger services and care at the time the sinking occurred.

(7) Cargo Carriers denied any liability for the sinking of the barge and then, alternatively, in the event they should be held liable therefor, claimed against Marine Leasing and PPG for their alleged failure to timely warn Cargo Carriers of the dangerous nature cf the cargo aboard the MTC–602 and asserted that the MTC–602 was not in a seaworthy condition when delivered to them for fleeting.

(8) Cargo Carriers, in addition, filed a third party complaint against Niagara Fire Insurance Co., American Motorists Insurance Co., the Travelers Insurance Co., and the Employers' Liability Assurance Corp., Ltd. (also referred to as the American Employers' Insurance Co.), as insurers of Marine Leasing, PPG, and the Barge MTC–602. Howard Stapp, Jr. and Bruce Barr Stapp, *in personam* (d/b/a Stapp Towing Co. and as owner, operator, and/or master of the towboat C. H. DUNBAR), the towboat C. H. DUNBAR, *in rem* (the tug which delivered the MTC–602 to Cargo Carriers

from PPG's Lake Charles Plant), and the XYZ Insurance Co. (their insurer), were also originally joined as third party defendants by Cargo Carriers, but all of these parties were voluntarily dismissed prior to trial.

(9) Niagara Fire Insurance Co., American Motorists Insurance Co., Travelers Insurance Co., and Employers' Liability Assurance Corp., cross-claimed against Cargo Carriers seeking contribution and/or indemnity for any liabilities that might be assessed against them.

*The MTC–602*

(10) The barge in question, MTC–602 (Official No. 269281), was an open hopper, steel tank barge built in 1955 and had registered dimensions of 175.1 feet in length, 26.1 feet in width, and 9.4 feet in depth.

(11) The MTC–602 was last inspected by the U. S. Coast Guard for certification for the carriage of liquid chlorine on rivers, bays, and sounds on July 23, 1964, at which time a certificate was issued. This certificate did not expire until July 23, 1966, well after the sinking.

(12) The MTC–602 had white signs with black lettering measuring four feet by two feet on either side at midships which stated:

"DANGER! CHLORINE NON–FLAMMABLE GAS TOXIC NO VISITORS."

On each of her eight cargo tank domes the word "CHLORINE" was painted in blue black letters. And there were six one-foot diagonal card holders, two at the stern, two amidships, and two on the bow, which carried red cardboard chlorine warning signs. Further, the barge was distinctive in that it had a red hull and white tanks, characteristic of chlorine barges.

*The Sinking*

(13) On September 2–3, 1965, PPG at its Lake Charles plant loaded 600 tons of liquid chlorine under approximately 130 pounds of pressure in the four pressure tanks of the barge MTC–602.

(14) PPG, by telephone, arranged with C&S Marine Service (C&S), who in turn made arrangements with the Stapp Towing Company (Stapp), for the towage of the MTC–602 from PPG's dock in Lake Charles, Louisiana, to the mooring facilities of Cargo Carriers on the Mississippi River at Baton Rouge, Louisiana.

(15) At the same time PPG arranged for the Upper Mississippi Towing Co. to pick up the MTC–602 in Baton Rouge and tow it on to Calvert City, Kentucky to fulfill a contract between PPG and B.F. Goodrich Chemical Co.

(16) The tug C. H. DUNBAR, owned by Stapp, and to whom C&S had subcontracted its portion of the towage of the MTC–602, arrived at the PPG docks in Lake Charles at approximately 10:45 p.m. on September 4, 1965.

(17) The Captain of the C. H. DUNBAR, Bruce Stapp, had received orders from his father, Howard Stapp, Jr., earlier that day to pick up the MTC–602. The Stapp Towing Co. had been towing chlorine barges out of PPG's Lake Charles plant since 1958.

(18) When the C. H. DUNBAR arrived at the PPG dock a uniformed plant guard met her Captain, Bruce Stapp, had him sign a barge release form and handed him a red banded "chemcard." This "chemcard," issued July, 1965, was headed "Chlorine Institute, Water Transportation Information Card; Chlorine, A Compressed, liquified gas; Liquid—clear amber; Gas—greenish yellow, much heavier than air." And in a box entitled "Hazards" were the following remarks:

"Fire—Will not burn, but will support combustion of certain substances.

Exposure—Gas is primarily a respiratory irritant; severe exposures can be fatal. Liquid and high concentrations of gas in contact with skin or eyes will cause local irritation or burns."

In addition, the card contained brief instructions "In case of Accident" specifying what should be done in the event of a "Spill or Leak," "Fire," or "Exposure."

And the card concluded with instructions that in all cases PPG in Lake Charles was to be called for further information.

(19) There is a dispute as to whether or not the Captain, Bruce Stapp, was given any instructions to pass the "chemcard" on to the next custodian, but this Court is convinced that, except for handing Captain Stapp the "chemcard," PPG's guard gave him no further instructions. This was only the second occasion that Bruce Stapp, personally, had been handed a "chemcard," and on the previous occasion the guard simply stated that "This is your card" in response to Captain Stapp's inquiry about it.

(20) Prior to getting under way, the MTC–602 was inspected by the crew of the C. H. DUNBAR. The hopper of the barge was found to be dry with less than two inches of water in her rakes, and the manhole covers were screwed down and secure.

(21) The C. H. DUNBAR got under way at approximately 1:30 a. m. September 5, towing the MTC–602 and one other barge.

(22) The trip from Lake Charles to Baton Rouge was uneventful. The C. H. DUNBAR made stops at Weaks Island and Morgan City, dropping one barge and picking up another, and then proceeded to Port Allen via the Morgan City-Port Allen route of the Intercoastal Canal Waterways system.

(23) Monday, September 6, 1965 was Labor Day.

(24) The C. H. DUNBAR entered the Port Allen Locks at 5:00 a. m., September 7, and while at the Port Allen Locks Captain Stapp called the Cargo Carriers' fleet boat, the MARION M., by radio telephone. Stapp informed the MARION M. that he had two barges for Cargo Carriers' fleet, a 35 foot freight barge loaded with salt (PCBL–103) and a 26 foot chlorine barge (MTC–602).

(25) The MARION M. instructed Stapp to tie his barges off on the ninth tier on the Baton Rouge side of the river (LSU–9) alongside the barge M–9 which was already moored at LSU–9.

(26) The C. H. DUNBAR and her two tows arrived at the LSU–9 mooring at 5:45 a.m. September 7 and found the M–9 tied to a shore mooring by a wire cable leading to the M–9's upstream inboard corner. Forming a nest of three barges, the C. H. DUNBAR tied off the PCBL–103 salt barge abreast of the M–9 and then tied the MTC–602 outboard of the salt barge using two six-inch manila lines fore and aft from the outboard bits of the PCBL to the inboard bits of the MTC–602 and using, in addition, a ¾ inch wire cable to further secure the upstream end of the MTC–602. The MTC–602 was thus the outboard barge of the group with all three barges secured to the shore by a wire cable leading to the M–9.

(27) While the C. H. DUNBAR was mooring the barges, the MARION M. came alongside in order to obtain a pound of coffee from the Captain.

(28) After the mooring was completed, the C. H. DUNBAR reported this fact to the MARION M. by radio and the MARION M. acknowledged receipt of the PCBL–103 and the MTC–602.

(29) The MTC–602 was trim, at an even keel, and without noticeable list throughout the period the C. H. DUNBAR had had her in tow from Lake Charles to Baton Rouge.

(30) It is not absolutely clear, but we are convinced that Captain Stapp of the C. H. DUNBAR did not pass on the chlorine "chemcard" to anyone on the MARION M. or to anyone else connected with Cargo Carriers. We are also of the opinion that the crew of the MARION M. and other persons associated with Cargo Carriers did not, at least until later, attach any particular significance to the markings on the MTC–602 or to the fact that it was a chlorine barge, although they had ample opportunity to note this fact. Chlorine barges like the MTC–602, with red hulls and white tanks, had previously been moored at Cargo Carriers' Baton Rouge fleet,

and the chlorine markings on the MTC–602 were clearly visible to the MARION M.

(31) If the C. H. DUNBAR had delivered the "chemcard" to the MARION M., her instructions were to turn the card in to the Cargo Carriers' office. However, Cargo Carriers did not restrict the types of barges that it would accept, and at this point in time no one was at all concerned about a hurricane. It is fair to assume in this case, from the evidence, that had the "chemcard" been delivered to Cargo Carriers it would have been treated as purely routine.

(32) During the time the MTC–602 was in Cargo Carriers' possession the various chartered tugs which worked for Cargo Carriers visually checked the barges in Cargo Carriers' fleet. No list or anything else unusual was noted as to the MTC–602.

(33) On the morning of September 9, 1965 two of Cargo Carriers' employees or agents, Paul L. Cokes and his brother, J. D. Cokes, made a brief inspection of Cargo Carriers' fleet. J. D. Cokes steered the CARANNE and Paul L. Cokes got out on the barges to make sure that they were tied off and that the lines were in good shape. When Paul checked the MTC–602 he noted that a cable was frayed so he replaced the wire cable from the MTC–602 to the PCBL–103 with another wire cable approximately one inch in diameter and 17 feet long. All of the other lines on the barge were considered to be adequate and in good shape. The MTC–602 was noted to be on an even keel and without noticeable list at this time.

(34) On Tuesday, September 7, 1965, C&S informed PPG that the MTC–602 had arrived in Baton Rouge and again on September 9, 1965, by a telex report from the Upper Mississippi Towing Company, PPG was advised that the MTC–602 was securely tied off in Baton Rouge and that the M/V PEACE was located in Baton Rouge ready to go northbound to Calvert City, Kentucky when the winds calmed. Actually, at that time, the PEACE was not in Baton Rouge, but it had been in Baton Rouge and returned there before the hurricane hit.

(35) Upon receipt of this telex, Frank Hinchey, the PPG Assistant Traffic Manager, telephoned Bob Gardiner of Cargo Carriers, Inc. about the MTC–602, pointing out that it was an open hopper chlorine barge. Mr. Hinchey also inquired about surveillance of the MTC–602 and requested that Cargo Carriers provide pumping services for the barge, but Cargo Carriers returned the call declining to provide the requested pumping services and informed PPG that the MTC–602 would receive the same treatment as any other barge in the fleet. This was the last effort PPG made to insure that the MTC–602 was safe and secure in Baton Rouge.

(36) On the morning of September 9, Cargo Carriers became aware of the fact that Hurricane Betsy might produce some heavier than usual winds in the Baton Rouge-Port Allen area, but it was not until late that night that the first advisory warned of the possibility of the hurricane striking in that area. As of 10:00 a. m. on September 9 the United States Weather Bureau Advisory predicted that the hurricane would strike somewhere in the vicinity of Lake Charles, Louisiana, many miles from Baton Rouge. The advisory of 12:00 o'clock noon on September 9 said that the hurricane was turning to the northwest and predicted it might go ashore between the mouth of the Mississippi River eastward to Mobile, Alabama, still many miles from Baton Rouge. At 300 p. m. on September 9 the advisory lowered the warnings in Texas and issued hurricane warnings for New Orleans, Louisiana, Mobile, Alabama, and Pensacola, Florida. At 5:00 p. m. on September 9 the advisory indicated that 150 mph winds were headed for New Orleans, and indicated that the hurricane was expected to turn more northward toward Mississippi and away from Baton Rouge. While there was a report from the Baton Rouge Weather Bureau about

8:00 p. m. on September 9 stating that Baton Rouge might experience hurricane force winds after midnight, it was not until 11:00 p. m. that night that Cargo Carriers had the first official indication that the hurricane was expected to pass over or close to Baton Rouge. At that time the Miami Weather Bureau Office stated that Hurricane Betsy was expected to pass to the northwest of New Orleans and over the cities of LaRose and Baton Route, Louisiana. By 1:00 a. m. on September 10, the eye of the storm was 25 miles south southwest of Baton Rouge. By the time of the first indication that the hurricane would in fact strike Baton Rouge, gale force winds were already present in the area, and had been there since 1:00 p. m. that afternoon. The eye of the storm actually passed over Baton Rouge at approximately 4:00 a. m. on September 10, 1965.

(37) In its storm preparations, Cargo Carriers gave most of their attention to the barges moored on the Port Allen side of the river because they were in groups of eight to twelve and were most difficult to secure. All of the larger groups of barges were placed in hard rigging, making them as secure as possible. But as later events showed, even these precautions could not save the barges from the wrath of Hurricane Betsy. The barges on the lower end of the LSU fleet, of which the MTC–602 was a part, were not considered to be a particular problem, because they were in small groups and would not exert as much pressure and weight on their lines. LSU–9 had only three barges.

(38) Cargo Carriers was advised by Upper Mississippi Towing Co. that the M/V PEACE was going to pick up the MTC–602, but they did not know how or when the pick-up was to be made. The M/V PEACE had been in Baton Rouge in the early part of the day on the 9th of September but had departed for New Orleans. At approximately 11:00 a. m. that day the Upper Mississippi Towing Co. called Cargo Carriers requesting that they contact the M/V PEACE and

tell her, because of the impending storm, not to go to New Orleans but to return to Baton Rouge. This they did and the M/V PEACE arrived in Baton Rouge and was given a place to tie herself off on the LSU side of the fleet at 4:50 p. m. There is nothing in the record to indicate that Cargo Carriers requested assistance of the M/V PEACE with reference to the MTC–602 or that the M/V PEACE in any way assumed responsibility for the MTC–602.

(39) At about the same time the M/V PEACE arrived in Baton Rouge, Cargo Carriers' rigging crew, which was rearranging barges to make a tow at LSU–10, temporarily tied off an "M" barge on the MTC–602. When the work at LSU–10 was complete, the MTC–602 was once again the last barge on the LSU–9 string.

(40) Between six and seven o'clock on the evening of September 9th the river was beginning to get rough and choppy. At that time Paul Cokes, while aboard the MARION M., said to Charley, a deckhand on the MARION M., that he thought the MTC–602 might sink.

(41) During Hurricane Betsy there was a rapid rise in the water level in the Mississippi River increasing the water level a total of 15.5 feet. There were short term variations in the height of the water of 8.9 feet. The speed of the river in the Baton Rouge area at the height of the storm was 29.2 mph.

(42) The force of the winds at the height of the storm were at least 92 miles per hour in the Baton Rouge area.

(43) After Hurricane Betsy had passed, all of the more than 90 barges in Cargo Carriers' fleet, with the exception of a few empties, had broken loose. The Barge DRAVO 45, which had been secured at the DRAVO Shipyard facility, had broken adrift despite the fact she had been moored with 17 or 18 steel cables.

(44) Hurricane Betsy was later described as probably the most destructive hurricane of modern times. As a result of this storm there were more than 400

vessels sunk in the Mississippi River between Baton Rouge and New Orleans.

(45) Hurricane Betsy created conditions which were beyond the ability of the open hopper chlorine barge, MTC–602, to withstand, and during Hurricane Betsy she took water into her hoppers and sank at or near her mooring place. Whether she broke loose from her mooring before she sank is not known, but she was later located some 180 feet out from the bank of the river.

(46) Not knowing until later that the MTC–602 had sunk, PPG, the Coast Guard, the Corps of Engineers, and private interests instituted a massive search for the barge. PPG rented a plane to fly over the area where the M/V PEACE was traveling to determine whether or not the MTC–602 was in the tow of the PEACE as earlier information had suggested. And on Sunday, September 12th, a second plane flew from the Baton Rouge bridge to the Gulf of Mexico in an effort to locate the MTC–602.

(47) The MTC–602 was equipped with a brightly colored buoy or "float." The Buoy was designed to free itself, surface, and float on the surface of the water if the barge sank, thus serving as a marker for the location of the sunken barge. Apparently the line became fouled and the buoy failed to surface when the MTC–602 sank.

(48) Nevertheless, after the fruitless search for the MTC–602, it was concluded that she had indeed sunk.

(49) The MTC–602 was finally located on the bottom of the river, right side up, approximately 180 feet from the left descending bank opposite the LSU campus.

(50) The barge was abandoned to the Government on September 17, 1965, but the U. S. Corps of Engineers refused to accept the abandonment, demanding that the petitioners remove the barge. The petitioners failed however to remove or arrange for the removal of the MTC–602.

(51) In view of the potential hazards and after having determined that the MTC–602 was a danger to navigation, the Government undertook the raising of the chlorine barge. The determination that the barge was a danger to navigation is not questioned by this Court. In the interest of public safety, considering the dangerous characteristics of chlorine, the actions taken by the Government to locate, mark and raise the barge and dispose of the chlorine were clearly appropriate.

(52) The Government raised the barge and disposed of the chlorine in a reasonable manner. The fact that there may have been other effective or cheaper means to accomplish the task is of no moment.

## CONCLUSIONS OF LAW

(1) Jurisdiction and venue exist by virtue of Title 46 U.S.C.A. §§ 183–189.

■ (2) Section 15 and Sections 19 and 20 of the Rivers and Harbors Act of 1899, Title 33 U.S.C.A. §§ 409, 414, and 415, do not specifically authorize a suit by the Government to recover removal expenses, but the right to remove carries with it the implied right to recover removal expenses. The United States Supreme Court in Wyandotte Transportation Co. v. United States, 389 U.S. 191, 205–206, 88 S.Ct. 379, 388, 19 L.Ed.2d 407 (1967), without actually ruling on the applicability of the Limitation Act, stated that:

" * * * under the Limitation of Shipowners' Liability Act of 1851, 9 Stat. 635, as amended, 46 U.S.C. § 181 et seq., the liability of a shipowner 'for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture' may be limited to 'the interest of such owner in such vessel, and her freight then pending'; but this limitation is available only if the act or damage occurred 'without the privity or knowledge of such owner.' 46 U.S.C. § 183. 'For his own fault, neglect and con-

tracts the owner remains liable.' American Car & Foundry Co. v. Brassert, 289 U.S. 261, 264, 53 S.Ct. 618, 619, 77 L.Ed. 1162 (1933). * * * Congress gave no indication, in passing the Rivers and Harbors Act, that it intended to alter or qualify the 1851 Act. In the congressional failure to connect these two statutes, we find at least some evidence that petitioners' discovery of a limitation of liability in the Rivers and Harbors Act is unwarranted."

Since Section 15 creates a duty on the owner to remove a sunken craft and since Sections 19 and 20 subject such a vessel to removal by the United States when the owner fails to remove it, the implication apparently found by the Supreme Court in *Wyandotte*, despite rather plain language in Section 15 that could easily be construed to the contrary, is that a negligent owner must either raise the vessel himself or pay for its removal. Section 15 refers only to a vessel which is wrecked or sunk "voluntarily or carelessly" however and does not cover a non-negligent sinking. See note 6 in *Wyandotte*, supra 389 U.S. at 197, 88 S.Ct. at 384. Thus, *Wyandotte* simply stands for the proposition that those who *negligently* cause the sinking of a vessel which obstructs navigable waters may be held personally liable to the United States for the expense of removing it. *Wyandotte* does not reach the question of liability where an innocent or non-negligent sinking occurs.

(3) Coast Guard regulations, 46 C.F.R. 98.01—1, 98.03—20, recognized that in September, 1965, an open hopper barge with negative buoyancy, such as the MTC–602, was suitable for the carriage of liquid chlorine on rivers, bays, and sounds. The regulations which governed the construction of new chlorine barges required modification of barges of this type in July of 1964, but old barges, like the MTC–602 were permitted to operate without modification until June 30, 1968. A four year grace period was given before existing vessels had to comply with the new regulations.

(4) It was not unusual for barges of this type to be in use in September of 1965 without the modification required by the Coast Guard. In fact even *after* September of 1965 it was reported that barges similar to the MTC–602, with open hoppers and cylindrical tanks, were being built. At any rate, it is clear that the use of the MTC–602, as it was being used in September of 1965, did not constitute negligence.

(5) The Government contends that Section 35.01—55 of 46 C.F.R. was applicable to the MTC–602 and that it required that at all times subsequent to the departure of the MTC–602 from PPG's dock in Lake Charles a "chemcard" be carried on the barge for ready reference and use by the person in charge, and the Government further contends that Section 35.01—50 of 46 C.F.R. was another regulation applicable to the MTC–602 requiring that the barge be "under constant surveillance." We find it unnecessary to determine the applicability of these regulations or whether or not, assuming they were applicable, a breach of them would constitute negligence so as to warrant recovery on behalf of the Government in this case. This Court concludes that neither the failure to pass the "chemcard" on to Cargo Carriers, nor the failure to provide continuous surveillance of the MTC–602 was a proximate cause of her sinking.

(6) There is, of course, no way of knowing for sure what would have occurred if Bruce Stapp of the C. H. DUNBAR had passed on the chlorine "chemcard" to someone connected with Cargo Carriers. It is certainly a possibility that notice of this type would have made Cargo Carriers more aware of the hazardous nature of this barge and its cargo. However, keeping in mind how rapidly Hurricane Betsy descended on Baton Rouge and how little time for preparation there was, the most Cargo Carriers could have been expected to do was to tie the MTC–602 more securely or in a different position in the fleet. The Government's suggestion that the

barge should have been taken to Devil's Swamp is appealing only because of the fact that, as it turned out, this happened to be a safe mooring place for the Tug SORA and her four barges. But to expect Cargo Carriers to have known that Devil's Swamp might have been the only safe place to moor the MTC–602 prior to the hurricane is preposterous. As stated in Petition of United States, 425 F.2d 991 (5th Cir. 1970) at page 995 when describing Hurricane Betsy, "both the severity of the winds and the extraordinary tidal surge were unprecedented." In our opinion, even if Cargo Carriers had been given the chlorine "chemcard," the most they could have been expected to do in anticipation of the storm was to tie the MTC–602 more securely and/or in a different position in the fleet. Even if this had been done, it would, in all probability, not have prevented the MTC–602 from sinking. As noted previously, after the hurricane all of the more than 90 barges in Cargo Carriers' fleet, with the exception of a few empties, had broken loose, and over 400 vessels broke loose and sank in the river between Baton Rouge and New Orleans.

(7) This Court is also of the opinion that constant surveillance would have been of no benefit. First of all, the fulfillment of such a requirement in the face of this storm would have endangered human life beyond any contemplation of the regulation requiring surveillance. Furthermore, in the throes of this hurricane, assuming that an observer had discovered that the barge was sinking, he could have done nothing to save it. Thus, constant surveillance, under these conditions, would have been a vain and useless thing.

(8) This Court is convinced that any violation of the cited regulations on the part of Marine Leasing, PPG, Cargo Carriers, the Stapps, or the C. H. DUNBAR, even if they were held to apply, was not a proximate cause of the sinking of the MTC–602.

(9) The Pennsylvania rule, stated in Humble Oil & Refining Co. v. Tug Cro-chet, 422 F.2d 602, 609 (5th Cir. 1970) rehearing denied (1970), establishes that a party who violates the Coast Guard regulations requiring that an information card or "chemcard" be carried on the barge and readily available and that the barge be under "constant surveillance" has the burden of showing that such violation does not have *any* causal relation to the sinking of the MTC–602. The defendants have successfully carried this burden.

(10) Furthermore, the burden of proving that Hurricane Betsy was the inevitable cause or a *vis major*, which human skill and precaution could not have prevented, rests with the party asserting such a defense. See Boudin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960); Massman-Drake v. Towboat M/V Hugh C. Blaske, 289 F. Supp. 700 (E.D.La.1968); Petition of United States, 300 F.Supp. 358 (E.D. La.1969) affirmed 425 F.2d 991 (5th Cir. 1970). The defendants have also carried this burden.

(11) We are convinced that Hurricane Betsy was a *vis major*, i. e., an Act of God. See Petition of United States, supra 300 F.Supp. at 366; Massman-Drake v. Towboat M/V Hugh C. Blaske, supra; Atlanta-Schiffahrts v. United States, 299 F.Supp. 781 (E.D.La.1969). The winds were over 90 miles an hour in the Baton Rouge area during the storm and there were literally hundreds of barges running loose on the Mississippi River and sinking. No precaution or preparation which Cargo Carriers could have reasonably been expected to make would have prevented the MTC–602 from sinking. No fleet of barges, no matter how well secured, was able to withstand the fury of the storm.

(12) We are convinced from the evidence in this case that following the Coast Guard regulations to the letter would not have prevented the sinking of the MTC–602 in the Mississippi River during Hurricane Betsy. The sole proximate cause of the sinking of the MTC–602 was the fury of Hurricane Betsy.

(13) We must, however, determine, in addition, whether or not Marine Leasing, PPG, and Cargo Carriers acted with ordinary prudence in anticipating when, where, and with what force the storm would strike. Boudin v. J. Ray McDermott & Co., 281 F.2d 81 (5th Cir. 1960) considered such a question with reference to a ship master's action immediately preceding Hurricane Audrey, which struck the Louisiana coast in June of 1957, and concluded that the tug master should have known that Audrey would strike where, when, and with the fury that she did and that he should have taken more precautions in the face of this threat. The erratic course of Hurricane Betsy made it extremely difficult to know where and with what force she would come ashore however, and therefore, in our opinion, the situation confronting the parties here must be distinguished from that which confronted the tug master in *Boudin*. The danger to the MTC–602 was not as apparent as was the danger to Tidelands 5 in *Boudin*, and the time given to react to Hurricane Betsy was significantly less than that given prior to the arrival of Hurricane Audrey. It is our conclusion that the parties here acted with ordinary prudence under the circumstances. When it was predicted that Hurricane Betsy would strike the Baton Rouge area there was so little time to react that it is unrealistic to suggest that Cargo Carriers had a duty to moor the MTC–602 in Devil's Swamp or any other such place that might, in retrospect, have been safe.

(14) Even after concluding that there was no negligence associated with the sinking of the MTC–602, this does not determine, finally, whether or not the United States may recover its removal expenses. There remains the question of whether or not the United States may recover such expenses from an innocent party. Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967) does not answer this question.

(15) Title 33 U.S.C.A. § 409 states in part:

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to *voluntarily or carelessly* sink, or permit or cause to be sunk, vessels or other craft in navigable channels; * * * And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, *accidentally or otherwise*, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title." (Emphasis added)

(16) It is significant to note that the statute refers to an unlawful sinking as one where the vessel or craft is "voluntarily or carelessly" sunk. Equity requires that the United States be reimbursed for its removal expenses in a case where the sinking was negligent, and the courts have now recognized this. See In re Pacific Far East Line, Inc., 314 F.Supp. 1339 (N.D.Cal.1970). However, equity does not demand that the United States recover its removal costs from the owner or operator of a vessel where the sinking is caused by a hurricane, and where there was either no negligence on the part of the owner or operator of the vessel or where his negligence, if any, played no part whatsoever in the sinking of the vessel.

(17) Since Title 33 U.S.C.A. § 409 refers only to "voluntarily or carelessly"

sunken vessels, we are of the opinion that this is controlling and that the United States has no right to recover removal costs in a case where the sinking is innocent or non-negligent.

(18) The statute goes on to state however that there is a duty on the owner to mark a vessel even when it is "accidentally" sunk. Thus, apparently, a different standard exists with regard to the duty to *mark* a sunken craft. As stated in Ray, The Wyandotte Decision, 38 Ins. Counsel J. 230, 232 (1971):

> " * * * it is proper to say at this juncture that in the absence of any directive from the Supreme Court in connection with an innocent sinking, it is reasonable to assume that the owner is still obligated to mark the position of the wreck until he abandons, but that after abandonment the only remedy which the Government has is *in rem* against the craft itself and perhaps against the cargo."

(19) At least a portion of the Government's expenses in this case consisted of searching for and locating the MTC–602. If the location of the MTC–602 had been known immediately after Hurricane Betsy—and a properly functioning buoy marking the location of the wreck would have accomplished this—the governmental expenses associated with locating the sunken barge would have been averted.

(20) Considering the nature of the cargo involved, the United States was obviously concerned about locating the MTC–602 and preventing a possible tragedy. Since the owner of the barge had, by statute, a duty to mark the sunken vessel immediately after it sank, and since it failed to do so, we think it is clear that the Government has the right to recover expenses incurred by it related to locating and marking the barge. Even if the apparent fouling of the line on the buoy was due to the hurricane and was not due to any fault of the owner, this would not allow the owner to escape that liability. The duty to mark a vessel exists whether the vessel is sunk carelessly, voluntarily, or "accidentally." 33 U.S.C.A. § 409. And obviously, the duty to locate is included within the duty to mark.

(21) This is not to say that the owner of every sunken vessel will necessarily have a duty to reimburse the Government for its expenses in assisting to locate such vessel. In the usual case there may be no need for governmental assistance and therefore governmental action might properly be considered in some cases as a gratuity. But here, it was imperative that this dangerous, sunken vessel be located with as little delay as possible, and the task of locating it promptly was obviously beyond the capabilities of the owners or operators of the vessel, particularly in view of the failure of the marking buoy on the vessel to operate. Hence the intervention of the Government in the search was necessary and proper, and thus the owners or operators of the barge must be held liable for expenses in connection therewith in view of their failure to perform their statutory duty to "locate and mark" the sunken vessel.

(22) While 33 U.S.C.A. § 409 speaks of the duty of the "owner" of a sunken craft to locate and mark it, we must nevertheless consider the "owner's" duty vis-a-vis the "charterer's" duty when, as in this case, the vessel involved is under a bareboat charter. In describing a bareboat charter Gilmore and Black, the Law of Admiralty 171 (1957) states:

> "In this form, the charterer takes over the ship, lock, stock, and barrel, and mans her with his own people. He becomes, in effect, the owner *pro hac vice*, just as does the lessee of a house and lot, to whom the demise charterer is analogous."

It goes on to say, at page 216:

> "The demise charter (or bare-boat charter) is thus not a documentary device for the *conduct* of the business of shipping; it is rather an instrument for vesting in one person most of the incidents of ownership in a capital asset of that business—the ship

—while another retains the general ownership and the right of reversion."、 There are several legal consequences of this characterization as owner *pro hac vice*. As such, the bareboat charterer qualifies as "owner" for purposes of the statutes relating to limitation of liability. See 46 U.S.C.A. § 186; Gilmore and Black, supra at p. 218. The bareboat charterer is liable in personam for liabilities arising out of the operation of the vessel; he is the warrantor of the seaworthiness of the vessel as to seamen and longshoremen working aboard her; and he is the "employer" for purposes of Jones Act claims. And we now hold that the bareboat charterer is the "owner" of the vessel insofar as the statutory duty to locate and mark a sunken vessel created by 33 U.S.C.A. § 409 is concerned. Such a duty rests entirely with the bareboat charterer of the vessel at the time of the sinking and not with the title owner of the vessel.

(23) Having concluded that under the circumstances of this case the United States has no right to recover removal costs, and it being apparent that the duty to locate and mark the sunken vessel did not by statute or otherwise, fall upon Cargo Carriers, this suit, as to Cargo Carriers, will be dismissed. And the dismissal as to Cargo Carriers carries with it, of course, a dismissal of the third party claims by Cargo Carriers against American Motorists Insurance Co., Niagara Fire Insurance Co., Employers Liability Assurance Corp., Ltd. and American Employers Insurance Co. as well as the cross claims filed by these insurance companies against Cargo Carriers.

(24) Having concluded that the United States is entitled to recover their costs related to locating and marking the sunken chlorine barge from the charterer and operator of the barge, Pittsburgh Plate Glass Company, judgment will be entered herein in favor of the United States of America and against Pittsburgh Plate Glass Company for the amount of costs incurred by the United States in locating and marking the sunk-

en barge MTC–602, and an order will be entered referring this matter to the United States Magistrate as Special Master for a determination of those costs.