**Edna HOWERTON, next friend of James Arthur Howerton, et al., Plaintiffs,**

v.

**MISSISSIPPI COUNTY, ARKANSAS, et al., Defendants.**

**George HOOVER, Jr., on Behalf of himself and all other Persons Similarly Situated, Plaintiffs,**

v.

**MISSISSIPPI COUNTY, ARKANSAS, et al., Defendants.**

**Nos. J–71–C–54, J–71–C–71.**

United States District Court,
E. D. Arkansas,
Jonesboro Division.

May 11, 1973.

Julian Tepper, W. Anthony Fitch, Stanley Herr, Washington, D. C., Thomas B. Tinnon, Mountain Home, Ark., John T. Lavey, Little Rock, Ark., Bart G. Mullis, Pine Bluff, Ark., Oscar Fendler, Blytheville, Ark., Eudox Patterson, Hot Springs, Ark., and Richard S. Arnold, Texarkana, Ark., for plaintiffs.

Graham Sudbury, Gerald Pearson, Pros. Atty., Second Judicial District, Blytheville, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, District Judge.

This case arises from two distinct complaints that the Court ordered consolidated for disposition. The complaints contain similar factual allegations, legal contentions, and prayers for relief; moreover, defendants in both cases are identical. The complaints are based on the alleged experiences of three inmates of the Mississippi County Penal Farm. In addition to their individual claims, plaintiffs raise class claims on behalf of all similarly situated. Named as defendants are: Mississippi County; A. A. "Shug" Banks, Mississippi County Judge; Dan Blodgett, former Superintendent of the Penal Farm; and James Bobbitt, present Superintendent of the Penal Farm. The objects of the suit are a declaratory judgment, preliminary and permanent injunctions, and "other appropriate relief" on the grounds that conditions and practices in the institution constitute "cruel and unusual punishment" contrary to command of the Eighth Amendment of the United States Constitution. Jurisdiction is invoked under 28 U.S.C. §§ 1343(3), 2201 (1970). The suit is in equity pursuant to the provisions of 42 U.S.C. § 1983 (1970). Plaintiffs allege deprivations under color of state law of rights, privileges and immunities secured by the Eighth, Thirteenth and Fourteenth Amendments to the Constitution.

The complaint alleges, *inter alia*, that inmates work with inadequate tools, without safety instructions, and with

co-workers inexperienced and unfit for labor; are poorly clothed, inadequately fed and given little medical care; are living under unsanitary conditions with inadequate sanitary plumbing, showers, or kitchen facilities; and are subject to assaults by fellow inmates who actually "run" the penal farm.

Plaintiffs attack Ark.Stat.Ann. § 46–502 et seq. (1947), which permits the compelling of misdemeanants to work on public projects and the contracting by one county or municipality with another to supervise, maintain, and work prisoners. Plaintiffs allege that defendant institution not only routinely forces those sentenced for misdemeanor violations by Mississippi County courts to work on public projects but also contracts with other governmental units outside of said county to house and work the latter's misdemeanor convicts. Plaintiffs allege: "This is in simplest terms a contract for involuntary servitude of inmates who are not sentenced by courts in Mississippi County. This results in out-of-county judges and sheriffs conveying to Mississippi County their poorest and most criminal inmates for this County Penal Farm to keep and labor, all to the danger of lives and liberties of Mississippi County inmates."

■ Shortly after the filing of this suit on September 29, 1971, defendants filed a motion for dismissal on the basis that the plaintiffs lacked standing to raise the issues surrounding the constitutionality of the penal farm since none were incarcerated therein at the time the suit was filed.[1] The Court concluded, however, (and so informed counsel in a letter of March 16, 1972) that after consolidation at least one of the plaintiffs had standing and that the suit was properly a class action on behalf of present and future inmates of the institution.

The Court understands that plaintiffs have received complete cooperation from the defendants. It has also been evident throughout the proceeding that the defendants sincerely desire to conform their facilities, operations, and procedures to constitutional standards.

After conferences with the Court on December 21, 1971, and July 20, 1972, the latter conference being combined with a visit by the Court to the challenged institution, the parties determined that the case could be submitted to the Court to be determined upon the pleadings, the on-site inspection, and stipulations filed by the parties.

By stipulation the parties have agreed to certain conditions of operation and maintenance of the facility that they believe will meet constitutional standards. The parties have also reduced, by stipulation, the remaining issues concerning the constitutionality of: (1) "working" misdemeanants; and (2) of accepting convicts from other governmental units (to be maintained and "worked" by the Mississippi County facility) to questions of law. Before dealing with these disputed questions, however, the Court must determine whether the conditions agreed to by the parties meet constitutional standards, it being remembered that this is a class action in which the interests of non-named members of the class must be carefully protected by the Court.

*Penal Farm History, Facilities and Operation*

The Mississippi County Penal Farm was created some forty years ago. For approximately 39 of those years it was operated as a farm with inmates perform-

---

1. In the initial suit, Howerton v. Mississippi County, J–71–C–54 (E.D.Ark., filed Sept. 29, 1971), plaintiffs are next friends of James Arthur Howerton and the administrator of the estate of Nathan Smith, Jr. Neither of the real parties of interest were incarcerated in the penal farm at the time suit was filed. George Hoov-

er, Jr., plaintiff in Hoover v. Mississippi County, J–71–C–71 (E.D.Ark., filed Nov. 12, 1971), was an inmate at the time the suit was filed; hence, his standing was sufficient after consolidation to support the class action that is stated in each complaint.

ing the necessary farm operations. The original barracks burned in 1960 and were reconstructed of reinforced concrete. They are now considered fireproof. Basically, the structure is in the shape of a cross with four wings directed toward the principal points on the compass. The east, south, and west wings are cell-block wings. Each of these wings is approximately 100 feet in length and about 30 feet wide. There are windows on each side of the long sides of the wings providing cross ventilation. The wings converge in a central lobby area. Eating, kitchen and office areas are located in the north wing. At the extreme north end of this wing is a smaller westward directed wing used for the housing of female inmates. Males are housed principally in the south and west wings without regard to race. Racial segregation at the institution was discontinued many years ago.

Each of the three main wings has shower facilities, two commodes, a lavatory, and urinals. The small wing has equivalent facilities. The building is heated by circulating hot water; three exhaust fans are used in conjunction with certain window arrangements during summer months to increase cross ventilation. The lobby area houses a "store" or supply center where inmates may obtain certain items of a sundry nature, including tobacco products and candy. Immediately north of the lobby area is the eating or dining quarters consisting of long wooden tables with benches where the inmates may be seated for their meals away from the cell blocks.

The east wing, which formerly housed "trusties", is used as an area where the inmates may visit their families or friends during certain hours. Visitors are permitted to enter the aisle along the north side of the east wing and inmates who have visitors are transferred from their regular cell block for the visitation period. Visitors and inmates are permitted to communicate freely; a wire mesh screen is in place along the cell bars to prevent the passing of articles to the inmates.

For many years inmates worked in what is commonly known as the "long line" in row crop operations on the county farm lands. The inmates engaged in the planting, cultivating, and harvesting of cotton, soybeans and other crops. Prior to the filing of this suit, a Quorum Court committee, appointed by defendant County Judge A. A. "Shug" Banks, recommended the discontinuance of farming operations with the use of convict or inmate labor, and the County Court has followed this recommendation. Inmates are now used only on county maintenance crews. While working on projects such as bridge repair or ditch cleaning, the inmates are under the supervision of employees of the County Road Department, who in effect act as guards on the job sites.

As of the time of the filing of this suit, there was no established policy regarding discipline within the institution. In the basement of the barracks building is a solitary confinement cell. However, its use was discontinued prior to the institution of this action. Corporal punishment has not been officially sanctioned during the administration of the present County Judge.

If corporal punishment has been administered, it has been directly contrary to the instructions and orders of the County Judge. Guards and other farm personnel have been instructed for many years that firearms are not to be used except for the purpose of self-defense. Indeed, policy forbids the firing upon even escaping inmates. The escape rate for the farm is probably higher than that of felony institutions. However, a high escape rate is one of the problems inherent in the maintenance of a misdemeanor institution.

The farm receives inmates from several courts in Mississippi County, including the Circuit Courts for the Osceola and Chickasawba Districts of the County, Municipal Courts at Osceola and Blytheville, and, infrequently, Mayor's or City Courts within the County. The farm, however, does not indiscriminately accept inmates, even if committed by a

Mississippi County Court. Since 1971 the farm administration has followed the recommendation of the Quorum Court committee and refused to accept as inmates persons under eighteen years of age.

The Mississippi County Penal Farm serves not only Mississippi County but also numerous counties and communities throughout the state. Originally misdemeanants were sent to the institution to "work out" their fines and the cost of their prosecution. Mississippi County reimbursed the committing governmental unit. Over a period of time beginning in 1961, the practice of reimbursement has been discontinued. As presently operated neither party to the commitment contract assumes any financial obligations to the other. Mississippi County has the facilities to house and work misdemeanants; the other committing counties and cities do not. The contracting governmental units derive the benefit of having local offenders incarcerated for their offenses and Mississippi County provides the means and facilities for doing so.

There are presently employed at the farm seven "free world" employees. The staff is now considered adequate; hence, the use of trusties in any capacity has been discontinued and defendants have agreed that the practice will not be reinstated.

■ Since the pendency of this case population and operations of the facilities have been curtailed significantly by the defendants.[2] Indeed, the Court is not so much considering the adequacy of an ongoing penal farm, as the constitutionality of numerous proposals to be implemented in a reactivated penal facility.

---

2. Prior to, and immediately following, the filing of these suits defendants made significant voluntary changes in the operation of the penal farm. Although self-initiated good faith efforts on the part of defendants have mooted many of the allegations in the original pleadings, the marked improvement in the operation of

*Constitutionality of Agreed Practices and Conditions*

In the initial stipulation filed in this action the parties stated:

"It is the desire of all parties hereto that the Mississippi County Penal Farm . . . be operated within minimum Federal Constitutional Requirements with due regard to the care and treatment of inmates confined therein by County officers and employees who may operate and control such facility and with commitment (sic) duty on the part of inmates to observe all reasonable work and disciplinary requirements of the supervising and custodial officers and employees within the framework of Federal Constitutional Requirements.

"The parties hereto stipulate and agree that the defendants have taken certain corrective measures in good faith to improve conditions at the Penal Farm and that prior to the institution of this action, certain corrective steps were already underway . . . .

"Plaintiffs and defendants are in accord that further improvements in the operation of the Penal Farm are to be undertaken if said Penal Farm is to be operated fully and in compliance with minimum Federal Constitutional Provisions."

Specific provisions of the stipulation require defendants to submit an application to the Law Enforcement Administration of the United States Department of Justice for planning funds for the Mississippi County correctional facilities and to explore methods and means of securing funds from other federal and state sources to improve the facility.

Pending the achievement of the above-stated goals, the defendants have

facilities and the stipulations as to future use and future practice were brought about, at least in part, by the efforts of plaintiffs and their attorneys. Therefore, the Final Decree entered pursuant to this Memorandum Opinion will award to plaintiffs their costs arising from this litigation.

agreed to operate the present facilities under the following restrictions: [3]

(a) Defendants will limit the institution's inmate population to forty except under temporary emergency conditions.

(b) No female child under the age of 18 and no male child under the age of 17 shall be accepted or confined at the Penal Farm under any circumstances.

(c) Male inmates and female inmates will not be kept in the same enclosure at the county farm. They will be kept separate and apart as has been the practice.

(d) Every effort will be made to improve sanitation at the county farm and to keep all facilities as sanitary as possible. The County Health Officer will be directed to make monthly inspections of the penal farm and to submit a written report to the County Court as to the compliance with this stipulation. Deficiencies noted in this report will be remedied and the County Court will be so notified in writing.[4] Extermination programs undertaken by commercial establishments as well as by inmates will be continued to eliminate from the premises harmful insects and rodents.

(e) Defendants will supply to the inmates changes of clothing satisfactory for the climate and maintain laundry facilities adequate to keep inmate clothing in a hygienic state.

(f) Defendants will provide three well-balanced and nutritious meals per day when the inmates are employed at labor and two such meals per day when inmates are not so employed. Defendants will not limit any inmate to a bread and water or other substandard diet for any reason.

(g) Defendants will institute and maintain a reasonable classification system to separate prisoners in the following manner:

1. Prisoners with histories relating to the excessive use or misuse of alcoholic beverages will be kept separate and apart from other inmates for such periods of time as deemed proper.

2. No classification or distinction among inmates will be made according to race, color or national origin.

3. Any inmate whose conduct or actions appear to supervisory personnel to be detrimental to or to affect the health, safety or well-being of other inmates may be kept separate and apart from other inmates and such separation shall carry no presumption of punishment but may be exercised for the proper control, health, safety and well-being of inmates.

4. Any prisoner with a contagious disease will be separated from other inmates as soon as such condition is determined pending medical treatment.

---

3. The restrictions, policies, and undertakings which follow are abstracts and summaries from the stipulations between the parties entered into on December 6, 1971, December 21, 1971, and May 4, 1972. The parties have also from time to time supplemented their stipulations by letter to the Court and by verbal statements, in conference with the Court and opposing counsel. The enumeration of the restrictions and undertakings is not intended to suggest that each is, or that all are, necessary to establish the constitutionality of the facility or its operation. They simply reflect the voluntary agreements of the parties.

4. In this regard the Court must note that the toilet facilities, including lavatories, showers and commodes, at the institution, at the time of the Court's visual inspection on July 20, 1972, were generally unclean and appeared unsanitary. The Court understands the stipulation to require defendants to work with health authorities to maintain the farm's toilet facilities in a reasonable state of cleanliness and repair.

(h) All inmates will receive prompt medical attention administered in a reasonable manner under reasonable conditions.[5]

(i) Defendants will provide adequate and hygienic bed clothing and provide sufficient soaps and cleaning materials to allow inmates to keep their bodies and environment in a clean and hygienic state.

(j) Reasonable supplies of writing materials for inmates will be made available.

(k) Defendants will not engage in any unreasonable practices concerning mail censorship.

1. Mail incoming from or outgoing to any court of record, state or federal, will not be opened.

2. Mail that indicates on the envelope that it comes from or is directed to any attorney will be considered to be privileged and remain unopened.

(l) Defendants will allow reasonable rights of visitation to inmates.

(m) Defendants will deliver weekly to the office of the Mississippi County Clerk at the Mississippi County Courthouse in Osceola, Arkansas, and make available therein as a matter of public information a list of all inmates who have been received by the Mississippi County Penal Farm within the immediately preceding week, together with appropriate information as to the committing court, the offense or offenses for which the inmate was convicted, the report of judgment as to fine, costs and imprisonment sentence, if any, and the age, sex and race or color of each defendant as provided to the County Farm Superintendent.

(n) The news media will not be barred from the institution. Due to the nature of the institution, however, officials may institute reasonable controls regarding visitation by newsmen and other persons.

(o) Religious services are and will be held each week at the penal farm. Attendance will be voluntary. Religious freedom is and will be encouraged at the institution and no inmate's freedom to worship in the religion of his choice will be hampered or interfered with by the institution.

(p) Guards and custodial personnel at the County Penal Farm will be required to undergo training or educational courses as approved by the Arkansas State Police or other appropriate agencies. Temporary or interim exceptions will be made pending full training and/or under emergency conditions.

(q) Disciplinary rules, a copy of which has been filed with the Court, will be distributed to each inmate as he arrives at the institution. The rules contain a statement of potential offenses and potential penalties and an outline of procedures to be followed by institution officials before disciplinary measures are taken. Those procedures include notice to the offending inmate of the nature of the charge lodged against him, an opportunity for the inmate to appear before an impartial panel to tell his version of the facts out of which the charge arises and to question witnesses before the panel. The final decision of the panel and the basis therefor will

5. The Court must remark that present medical facilities at the institution are probably inadequate for the custody of the chronically or seriously ill.

be reduced to writing for the inmate's inspection.[6]

■ In reviewing the stipulations of the parties regarding current practices and future undertakings, the Court is guided by the analysis of Chief Judge Henley in the several opinions written concerning conditions and practices in the Arkansas state correctional facilities at Tucker and at Cummins.[7] In that series of opinions particular conditions and practices were found to be constitutionally repugnant: corporal punishment, Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968); confinement of inmates in isolation cells that are overcrowded and unsanitary, Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969); failure to use ordinary care to protect the lives of inmates, *Id.*; the delegation of substantial portions of institution management to "trusties", Holt v. Sarver, 300 F.Supp. 362 (E.D.Ark.1970), aff'd., 442 F.2d 304 (8th Cir. 1971); and the segregation of inmates within the institution according to race, *Id.* Concerning Eighth Amendment abridgments Judge Henley has stated:

"It appears to the Court, however, that the concept of 'cruel and unusual punishment' is not limited to instances in which a particular inmate is subjected to a punishment directed at him as an individual. In the Court's estimation confinement itself within a given institution may amount to a cruel and unusual punishment prohibited by the Constitution where the confinement is characterized by conditions and practices so bad as to be shocking to the conscience of reasonable civilized people even though a particular inmate may never personal-

ly be subject to any disciplinary action."

Holt v. Sarver, 309 F.Supp. at 372–373. Extrapolating from the particular practices previously found to be unconstitutional and applying the general standards regarding cruel and unusual punishment, the Court must conclude that the operation and maintenance of the Mississippi County Penal Farm in good faith compliance with the agreement referred to above will meet constitutional standards.

*Intergovernmental Custody Contracts and Compulsory Labor*

The remaining questions to be resolved by the Court are: (1) Whether the "working" of misdemeanants without compensation on public projects is contrary to constitutional principles, and (2) whether the contracting between government units to incarcerate and work convicts from foreign political subdivisions (within the State of Arkansas but outside of Mississippi County) as provided by Section 46–504 of Ark.Stat. Ann. (1947) offends the Constitution.

Plaintiffs maintain that a person convicted of a misdemeanor cannot be compelled to work, but must be given a choice. In addition, contend plaintiffs, if an inmate chooses to perform work for the county, he must be compensated at the rate of the prevailing minimum wage. Otherwise, argue plaintiffs, incarceration in the county penal farm would run afoul of constitutional proscriptions of involuntary servitude and cruel and unusual punishment. As a corollary to these contentions, plaintiffs pray that Section 46–504 be declared unconstitutional because, they contend, it

---

6. The methods by which inmates are and will be disciplined is not disclosed by the stipulations. The Court must assume defendants propose to employ standard methods such as denial of privileges and, in extreme and legally appropriate circumstances, isolation. Defendants did point out to the Court at the inspection tour of the facility a structure, then under construction, that would serve as a disciplinary cell. At that time the

Court questioned the adequacy of the lighting and ventilation in the structure. It now assumes those defects have been remedied.

7. We are not here applying the more stringent requirements applicable to the conditions of pre-trial incarceration. See Hamilton v. Love, 328 F.Supp. 1182 (E. D.Ark.1971).

allows one political subdivision to contract with another to "work" misdemeanants. Defendants respond by asserting that the working of misdemeanants without compensation is constitutional and that the contracting between political units under Section 46–504 is permissible.

The simple "working" of inmates on county work crews as a part of their sentence should be distinguished from the working of inmates to pay fines and costs. Defendants concede that former practice was to use inmate labor to "work off" fines and costs chargeable to the misdemeanant. Contracts with other political subdivisions were also on this basis. Defendants have stipulated to the unconstitutionality of these past practices under Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971), and presently refuse to accept misdemeanants, whether committed locally or by a foreign political subdivision, who are to be incarcerated solely for failure to pay fines or costs.

■ The "working" of inmates committed to a term of incarceration independent of any abridgment of the principle stated in Tate v. Short, however, is a distinct question. The Thirteenth Amendment to the Constitution provides: "Neither slavery nor involuntary servitude, *except as a punishment for crime whereof the party shall have been duly convicted,* shall exist within the United States, or any place subject to

their jurisdiction". [Emphasis added]. Courts have long held that reasonable work requirements may be imposed on one convicted of a crime, whether misdemeanor or felony, without running afoul of the Thirteenth or Eighth Amendments. *See,* e. g., Butler v. Perry, 240 U.S. 328, 36 S.Ct. 258, 60 L.Ed. 672 (1916); Draper v. Rhay, 315 F.2d 193 (9th Cir.), cert. denied, 375 U.S. 915, 84 S.Ct. 214, 11 L.Ed.2d 153 (1963); Holt v. Sarver, 309 F.Supp. at 369–372; Wilson v. Kelly, 294 F.Supp. 1005, 1012 (N. D.Ga.1968). In the present case, where work is conducted in a reasonable manner under public authority,[8] the Court finds no constitutional deprivation. Furthermore, no court has imposed the requirement that, as a condition precedent to the imposition of a compulsory work program, a state must agree to compensate inmates. Indeed, the Eighth Circuit has expressly stated that any scheme or program of prisoner compensation exists only by the grace of the state. Sigler v. Lowrie, 404 F.2d 659, 661 (8th Cir. 1969).

■ In a letter supplementary to their trial brief, plaintiffs raise a second argument concerning the unconstitutionality of the working of inmates. Relying on Ward v. Village of Monroe, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), and Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), plaintiffs argue that the working of inmates for profit by the county presents an unconstitutional conflict of interest

---

**8.** Arkansas law limits the type of enterprise in which convict labor may be employed:

"Any person who may be convicted of a misdemeanor or petty offense by any court in this State, and who shall be committed to jail to serve a sentence imposed by any court of competent jurisdiction . . . may be required to discharge such sentence . . . by manual labor in any workhouse, farm, street, road, bridge, or other public work . . . provided that such workhouse, farm, road, street, bridge, or other public work shall be owned, operated, or conducted by the State of Arkansas, any county thereof, or a city

or incorporated town within the State of Arkansas."
Ark.Stat.Ann. § 46–502 (1947).
Early in the course of this litigation defendants maintained that inmates of the penal farm could be employed in quasi-public projects such as improvement districts. Although the Court has grave reservations about the practice, not only under the terms of the quoted statute but also under constitutional principle, it does not have to face the issue since counsel for defendant stated to the Court in conference with counsel for the plaintiffs on July 20, 1972, that defendants would confine convict work assignments to public projects.

apparently because the chief executive officer of the county, with wide-ranging administrative responsibilities, is also charged with administration of the county penal farm. The Court believes *Ward* and *Tumey* do not reach so far as plaintiffs contend. Those cases were bottomed on denials of procedural due process. The *judicial* official's financial interest in the outcome abridged petitioner's right to a hearing before an impartial hearing officer. Here the County "Judge", for all pertinent purposes, is an administrative, not a judicial, officer and has no say in the conviction and sentencing process.

■ Plaintiffs also challenge, independent of the compulsory labor issue, the practice of receiving under custodial contracts persons sentenced by foreign political units. Within this challenge falls Section 46–504.[9] Plaintiffs argue that the true purpose of Section 46–504 "is not only to provide a place for counties with inadequate facilities, to incarcerate their county and city prisoners, but also that the convicting county or city shall be assured of payment of its fines and costs."

Plaintiffs' Trial Brief at 16.

Hence the apparent basis for plaintiffs' challenge to the statute is that Tate v. Short abridgments are produced by the scheme. The Court understands how this was a possibility under past practice, but fails to appreciate the constitutional ramifications of the contractual scheme in the light of defendants' undertaking to accept only those misdemeanants sentenced to terms of incarceration.

The Court notes that modern theories of allocation of resources for penal institutions contemplate the possible creation of regional centers for misdemeanant incarceration.[10] The questioned statute provides one means for implementing the contemplated reform and, properly followed, raises no serious constitutional problems.

A decree will this day be entered in accordance with this memorandum opinion.

## FINAL DECREE

In conformity with the Court's findings of fact and conclusions of law set forth in the Memorandum Opinion filed this day, it is hereby ordered, adjudged and decreed that:

1. Plaintiffs' prayer for declaratory and injunctive relief is denied;

2. Plaintiffs' claims challenging the constitutionality of Arkansas Statutes Annotated § 46–502 et seq. (1947) are dismissed with prejudice;

3. Plaintiffs be awarded their costs.

---

9. Although plaintiffs level an unequivocal challenge to the constitutionality of a state statute and request injunctive relief, neither party has requested a three-judge court under 28 U.S.C. § 2281 (1970). The Court determined early in the proceeding that it was not required to impanel a three-judge court under the teaching of Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933), that in a case where the challenge to the statute is insubstantial a single judge court may dismiss the contention for want of a substantial federal question.

10. *See* Omnibus Crime Control Act of 1970 § 6(a), 42 U.S.C. § 3750b(6) (1970). One purpose of the Act is to establish a new program for the construction, acquisition, and renovation of correctional facilities and programs. Provisions of the Act set out criteria by which state applications for grants under the Act are to be evaluated. Concerning the above-cited subsection the Senate Report on the Act states:

"Subsection (6) requires the State plan to provide, where feasible and desirable, for the sharing of correctional institutions and facilities on a regional basis. . . . It would not be feasible, nor can the Nation afford, to replace all of the existing unsatisfactory jails with correctional centers. In most States, it is possible for several counties, or for combinations of counties and cities, to use a central facility. This provision is intended to encourage such regionalized arrangements where possible."

S.Rep.No.91–1253, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News 5804, 5829.